794 A.2d 325

Joann ERFER and Jeffrey B. Albert, Petitioners,

v.

The COMMONWEALTH of Pennsylvania; Mark S. Schweiker, in
his official capacity as Governor of Pennsylvania; Kim Pizzin-
grilli, in her official capacity as Secretary of the Common-
wealth of Pennsylvania; Richard Filling, in his official capaci-
ty as Commissioner of the Bureau of Commissions, Elections,
and Legislation of the Pennsylvania Department of State;
Robert C. Jubelirer, in his official capacity as Lieutenant
Governor of Pennsylvania and President of the Pennsylvania
Senate; Matthew J. Ryan, in his official capacity as Speaker of
the Pennsylvania House of Representatives, Respondents.

Supreme Court of Pennsylvania.

Submitted Feb. 13, 2002.

Decided March 15, 2002.

Robert B. Hoffman, Harrisburg, for JoAnn Erfer, et al.

Linda J. Shorey, Julia Marie Glencer, Jason E. Oyler, John P. Krill, Harrisburg, for Robert C. Jubelirer.

J. Bart DeLone, John G. Knorr, Harrisburg, for Mark Schweiker.

Before ZAPPALA, C.J., and CAPPY, CASTILLE, NIGRO, NEWMAN, SAYLOR and EAKIN, JJ.

## OPINION

CAPPY, Justice.

This opinion is filed in support of the per curiam order of this court dated February 15, 2002. That order dismissed the state constitutional law claims raised in JoAnn Erfer and Jeffrey Albert's Petition for Review.

This matter concerns the General Assembly's plan redrawing federal congressional districts to comport with the results of the 2000 Census. See Act No. 2002–1 ("Act 1"). JoAnn Erfer and Jeffrey Albert ("Petitioners") filed a Petition for Review with the Commonwealth Court on January 10, 2002, raising federal and state constitutional law challenges to Act 1. In light of the fact that February 19, 2002 is the opening date and March 12, 2002 is the closing date for the circulation and filing of nomination petitions for the 2002 elections, Petitioners also requested that the Commonwealth Court expedite its consideration of this matter.

On January 22, 2002, the Commonwealth Court, however, scheduled to hear this matter on March 13, 2002, one day after the closing date for the circulation and filing of nomination petitions. On January 25, 2002, Petitioners filed an emergency Application with this court, requesting that we exercise plenary jurisdiction over this matter and set an expedited hearing schedule. Notably, they requested that only their Pennsylvania Constitutional law claims be resolved on an expedited basis. We granted plenary jurisdiction and remanded this matter with the directive that the Commonwealth Court's findings of fact and conclusions of law should be filed with this court by February 8, 2002.

The Honorable Dante Pellegrini of the Commonwealth Court promptly held hearings in this matter. While Petitioners raised several state constitutional law claims, they focused primarily on their claim that the legislature engaged in unconstitutional political gerrymandering in drawing up Act 1 in violation of the equal protection guarantee, Pa. Const. art. 1, §§ 1 and 26, and the free and equal elections clause, Pa. Const. art. 1, § 5. Petitioners acknowledged that based on voter registration figures, Act 1 grants rough parity to the two dominant political parties. *See* Pellegrini's Recommended Findings of Fact and Conclusions of Law, dated February 8, 2002, (hereinafter "Pellegrini Opinion") at 12–13 (discussing statistics related to voter registration in the nineteen districts).[1] Thus, based solely on voter registration, there was no evidence of political gerrymandering. Yet, Petitioners did not contend that the evidence of gerrymandering could be found based upon the registration of the voters. Rather, they claimed that based upon the statistics of how voters actually cast their ballots in the past, the complexion of the districts was such that a Republican candidate would win in 13 or 14 of the 19 districts.

Judge Pellegrini agreed with Petitioners that roughly two-thirds of the districts would probably be won by Republicans, and that the legislature took the information it gleaned from analyzing voting trends and deliberately drew the congressional districts so as to grant an advantage to the Republican party. *See* Pellegrini Opinion at 350–351 and 356. Yet, Judge Pellegrini opined that Petitioners could not prevail on their gerrymandering claim, and were thus not entitled to relief, because Petitioners did not constitute an "identifiable political salient class". Pellegrini Opinion at 27.[2] The parties were then directed to file briefs with this court.

1.  The Pellegrini Opinion is attached at Appendix A.

2.  Petitioners also apparently pursued a state constitutional "one person, one vote" claim before Judge Pellegrini. *See* Pellegrini Opinion at 25. They also raised state constitutional law claims asserting an abridgement of their rights to free speech and free assembly. *See* Pa. Const. art. 1, §§ 7 and 20. Judge Pellegrini concluded that Petitioners were not entitled to relief on these claims. *See* Pellegrini Opinion at 25,

As we exercised plenary jurisdiction over this matter, but did not relinquish our jurisdiction when we ordered Judge Pellegrini to hold hearings and issue a report, our review of the Pellegrini Opinion is *de novo*. *Annenberg v. Commonwealth*, 562 Pa. 581, 757 A.2d 338, 343 (2000). Yet, we note that "when addressing the findings of fact made by [Judge Pellegrini], although such findings are not binding on us, we will afford them due consideration, as the jurist who presided over the hearings was in the best position to determine the facts." *Id.*

At the outset, we must address the claim raised by Lieutenant Governor/President Pro Tem of the Senate Jubelirer and Speaker Ryan (collectively, "the Presiding Officers") that Petitioners do not have standing to pursue this matter. The Presiding Officers raised this issue below via preliminary objections and Judge Pellegrini opted not to address it. Pellegrini Opinion at 20. They raise two major arguments in support of their position

■ First, the Presiding Officers contend that Petitioners cannot attack the constitutionality of the reapportionment plan as a whole. Rather, the Presiding Officers claim that Petitioners have standing to attack the constitutionality of Act 1 only as it relates to their districts, and may not challenge Act 1 with regard to how it draws the lines for other districts in this Commonwealth. In support of this claim, they rely heavily on the U.S. Supreme Court's decision in *United States v. Hays*, 515 U.S. 737, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995).

Regardless of whether the Presiding Officers have correctly divined the holding of *Hays* as it relates to a determination of standing in matters commenced in federal court, it does not control our resolution of the standing issue. The U.S. Supreme Court has unequivocally declared that "state courts are not bound to adhere to federal standing requirements...." *ASARCO Inc. v. Kadish*, 490 U.S. 605, 109 S.Ct. 2037, 2045, 104 L.Ed.2d 696 (1989). The high Court recognized that in

27–28. In their brief to this court, Petitioners fail to pursue these claims. Thus, they will not be considered by this court.

resolving issues of standing, state courts are not constrained by the dictates of Article III of the United States Constitution. *Id.* Thus, *Hays* does not control the outcome of this issue.

█ This court has not squarely addressed whether a litigant challenging a plan reapportioning congressional districts may attack the entirety of the plan, or is relegated to complaining about merely the district in which he lives. This gap, however, may be filled by applying our general rule of standing to this matter. We have stated that a party has standing where that party is "aggrieved". *In re T.J.*, 559 Pa. 118, 739 A.2d 478, 481 (1999). "For a party to be aggrieved, it must have: 1) a substantial interest in the subject matter of the litigation; 2) the party's interest must be direct; and, 3) the interest must be immediate and not a remote consequence of the action." *Id.* (citations and internal quotation marks omitted).

The Presiding Officers would have us declare that a litigant challenging a reapportionment plan can have a substantial, direct, and immediate interest in only that portion of the plan which drew the lines for his particular district. We believe such a narrow interpretation to be discordant with the reality of challenging a reapportionment scheme. In mounting such an attack, a litigant cannot logically confine his challenge to his particular district. A reapportionment plan acts as an interlocking jigsaw puzzle, each piece reliant upon its neighbors to establish a picture of the whole. An allegation that a litigant's district was improperly gerrymandered necessarily involves a critique of the plan beyond the borders of his district. Thus, we decline to find that a litigant challenging a reapportionment scheme must confine his attack to the drawing of the lines of his own district.

█ The Presiding Officers also make a brief argument that political gerrymandering claims may be raised only by the Pennsylvania State Democratic Committee ("Democratic Committee") and not by individual voters.

The Presiding Officers have unwittingly presented an argument that is the mirror-opposite of what we have recently

declared to be the law of standing in reapportionment matters. Shortly after the Presiding Officers filed their brief in this matter, we declared that "any entity not authorized by law to exercise the right to vote in this Commonwealth lacks standing to challenge the reapportionment plan." *Albert v. 2001 Legislative Reapportionment Comm'n,* 567 Pa. 670, 679, 790 A.2d 989, 995 (2002). This conclusion was compelled by the fact that it is "the right to vote and the right to have one's vote counted that is the subject matter of a reapportionment challenge. . . ." *Id.* Clearly, a political committee does not have the right, in and of itself, to vote. Thus, contrary to the Presiding Officers' contention, the Democratic Committee (or its leaders acting in their official capacities) are not the only entities that could have standing in this challenge; in fact, the Democratic Committee is specifically denied standing to assert such a challenge.[3] We therefore reject this argument.

■ The Presiding Officers assert that even if Petitioners are the proper parties to bring this challenge, we should still dismiss the matter without examining the merits. They contend that none of the protections afforded by the Pennsylvania Constitution may be extended to congressional elections; rather, they claim that the only applicable constitutional provisions are contained in the U.S. Constitution. In support of this contention, they note that the United States Constitution has given the state legislatures the power to draw congressional reapportionment plans. *See* U.S. Const. art. I, § 4, cl. 1. Thus, they conclude, as the legislature's power to effect a

3. The Presiding Officers also briefly assert that Petitioners are unable to pursue this matter as they never adduced any evidence that Petitioners even exist, and thus Petitioners are no more than straw litigants. This argument must be rejected. The record reveals that Petitioners appended signed verifications that the averments contained in their Petition for Review are true and correct; these averments contain allegations that they are registered Democrats residing within Pennsylvania. Thus, we cannot accept the Presiding Officers' argument that Petitioners lack standing as there is no evidence that they exist.

Furthermore, to the extent that these verifications would be deemed insufficient to establish Petitioners' existence, a remand to Judge Pellegrini to hold a hearing on this limited issue would be a waste of judicial resources as we have determined that Petitioners are not entitled to relief on the substance of their state constitutional law claims.

congressional reapportionment derives from the U.S. Constitution, then the Pennsylvania Constitution is inapplicable to a congressional reapportionment plan. They argue that we should thus deny Petitioners relief without examining the substance of the state constitutional law claims.

It is true that the U.S. Constitution has granted our legislature the power to craft congressional reapportionment plans. Yet, we see no indication that such a grant of power simultaneously suspended the constitution of our Commonwealth vis-à-vis congressional reapportionment. Without clear support for the radical conclusion that our Commonwealth's Constitution is nullified in challenges to congressional reapportionment plans, it would be highly inappropriate for us to so circumscribe the operation of the organic legal document of our Commonwealth. We therefore reject this argument.

The Presiding Officers also make a fleeting argument that the free and equal elections clause, Pa. Const. art. 1, § 5, applies only in elections for offices of the Commonwealth. As the position of representative to the United States Congress is not an office of the Commonwealth, they reason, then this provision has no application to congressional elections. We reject this argument as nothing in the plain language of the free and equal elections clause limits it to elections for Commonwealth officials.

Having determined for the purposes of our review that Petitioners have standing and that the Pennsylvania Constitution applies to congressional reapportionment plans, we may now turn to the substance of Petitioners' challenge. The crux of this dispute is whether Petitioners have established that Act 1 constitutes unconstitutional political gerrymandering in violation of the equal protection guarantee, Pa. Const. art. 1, §§ 1 and 26, and the free and equal elections clause, Pa. Const. art. 1, § 5. As with any legislative enactment, Act 1 enjoys a presumption of constitutionality. *Commonwealth v. Means*, 565 Pa. 309, 773 A.2d 143, 147 (2001). A plaintiff bears a heavy burden to prove it unconstitutional. "A statute will only be declared unconstitutional if it clearly,

palpably and plainly violates the constitution." *Id.* (citations omitted).

This court did not always recognize that a claim of political gerrymandering was cognizable under the Pennsylvania Constitution. *See Newbold v. Osser,* 425 Pa. 478, 230 A.2d 54 (1967). This court changed tack, however, in our unanimous decision *In re 1991 Reapportionment,* 530 Pa. 335, 609 A.2d 132 (1992), and recognized that a litigant could raise claims that a reapportionment plan effected a political gerrymander and thus violated the U.S. and Pennsylvania Constitutions. This new view on the justiciability of political gerrymandering claims was predicated on the U.S. Supreme Court's decision in *Davis v. Bandemer,* 478 U.S. 109, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986), wherein the Court held that such claims were cognizable as a violation of the Equal Protection Clause.

Once having determined that the claim was justiciable, the next task for the *1991 Reapportionment* court was to define the contours of the test for determining whether unconstitutional political gerrymandering had occurred. Unfortunately, a majority of the *Bandemer* Court was unable to agree on the parameters of such a test. While the *Bandemer* Court issued no holding on this point, the *1991 Reapportionment* court opted to follow the test set forth by the *Bandemer* plurality. The *1991 Reapportionment* court then proceeded to utilize the test set forth by the *Bandemer* plurality to resolve both federal and state constitutional political gerrymandering claims.

In resolving Petitioners' claim that Act 1 is a political gerrymander in violation of the Pennsylvania Constitution, we will continue the precedent enunciated in *1991 Reapportionment* and apply the test set forth by the *Bandemer* plurality. We reject Petitioners' arguments that we should declare that the right to vote guaranteed by our Commonwealth's Constitution provides broader protections than those guaranteed by the federal Equal Protection Clause. We come to this conclusion for two reasons. First, to the extent that Petitioners' gerrymandering claim is predicated on the equal protection

guarantee contained in Pa. Const. art. 1, §§ 1 and 26, this court has previously determined that this right is coterminous with its federal counterpart. *Love v. Borough of Stroudsburg*, 528 Pa. 320, 597 A.2d 1137 (1991). Second, we reject Petitioners' claim that the Pennsylvania Constitution's free and equal elections clause provides further protection to the right to vote than does the Equal Protection Clause. Petitioners provide us with no persuasive argument as to why we should, at this juncture, interpret our constitution in such a fashion that the right to vote is more expansive than the guarantee found in the federal constitution. *See generally Commonwealth v. Edmunds*, 526 Pa. 374, 586 A.2d 887 (1991).

While we continue to adhere to the view that the disposition of political gerrymandering claims should be controlled by the *Bandemer* plurality, we are also fully cognizant of the fact the plurality's opinion has bedeviled both commentators and courts, obscuring via its labyrinthian twists and turns of logic the precise nature of the standard to be employed. *See, e.g.*, Michael E. Lewyn, *How to Limit Gerrymandering*, 45 Fl. Law Rev. 403, 443 (1993) (The *Bandemer* plurality has "confounded legislators, practitioners, and academics alike. Some find the case internally incoherent; others find a method to the madness." (internal quotation marks and citation omitted)). Yet, we find that by carefully parsing out the plurality's language, we can arrive at a simple (although decidedly not simplistic) recitation of the test. Distilled to its essence, the plurality's test states that a plaintiff raising a gerrymandering claim must establish that there was intentional discrimination against an identifiable political group and that there was an actual discriminatory effect on that group. *Bandemer*, 478 U.S. at 127, 106 S.Ct. 2797. In establishing that there has been a discriminatory effect, the plaintiff must show two things: first, he must show that the identifiable group has been, or is projected to be, disadvantaged at the polls; second, he must establish that by being disadvantaged at the polls, the identifiable group will "lack . . . political power and [be denied] fair representation." *Id.* at

139, 106 S.Ct. 2797 (hereinafter referred to as the "effects test").

The first determination we must make is whether Petitioners have shown that the legislature in crafting Act 1 intentionally discriminated against an identifiable political group. The *Bandemer* plurality candidly recognized that in most instances, intentional discrimination would not be difficult to show since "[a]s long as redistricting is done by a legislature, it should not be very difficult to prove that the likely political consequences of the reapportionment were intended." *Bandemer*, 478 U.S. at 129, 106 S.Ct. 2797. In the matter *sub judice*, Judge Pellegrini found that the legislature deliberately drew the congressional districts so as to grant an advantage to the Republican party and thus concluded that there was a discriminatory intent. *See* Pellegrini Opinion at 350–351 and 356. We see no basis to reject this conclusion.

Judge Pellegrini was not persuaded, however, that Petitioners had shown that citizens who vote Democratic (but are not necessarily registered Democrats) are an identifiable political group. He contended that Petitioners should be denied relief because they had failed to show that "[v]oters who are likely to vote Democratic (or Republican) in a particular district though not registered Democrats (or Republicans) based on the candidates or issues" are an identifiable political group. Pellegrini Opinion at 27.

We cannot agree with such a sweeping conclusion. While we are uncertain whether Petitioners' evidence established that there is an identifiable political class of citizens who vote for Democratic congressional candidates, we also find it to be imprudent to state, as a blanket proposition, that future plaintiffs could never adduce sufficient evidence to establish that such an identifiable class exists. We surmise that, particularly since the field of information technology is advancing at a breakneck speed, such a showing could be made by future challengers. However, it is not incumbent upon us to resolve this thorny issue as Petitioners' claim falters on another basis. Thus, in this matter, we will assume without deciding that

Petitioners have shown the existence of an identifiable political group.

The finding that there was an intent to discriminate and the assumption that Petitioners have shown the existence of an identifiable political class allows Petitioners to clear only the first hurdle of the test set forth by the *Bandemer* plurality. In order to show that there has been unconstitutional political gerrymandering, Petitioners must also show that the reapportionment plan works "an actual discriminatory effect. . . ." *Bandemer*, 478 U.S. at 127, 106 S.Ct. 2797. As noted *supra*, the plaintiff must prove two things in order to establish an actual discriminatory effect. First, he must show that the reapportionment plan works disproportionate results at the polls; this can be accomplished via actual election results or by projected outcomes of future elections. *Id.* at 139, 106 S.Ct. 2797. Second, he must adduce evidence indicating a "strong indicia of lack of political power and the denial of fair representation." *Id.* To meet this second prong of the effects test, the discriminated against group must show that it has "essentially been shut out of the political process." *Id. See also Pope v. Blue,* 809 F.Supp. 392 (W.D.N.C.1992); *Badham v. Eu,* 694 F.Supp. 664 (N.D.Cal.1988) (discussing the two prongs of the *Bandemer* plurality's actual discriminatory effects test).

We emphasize that the effects test is conjunctive in nature, and that both showings of an actual discriminatory effect must be made. The plurality explicitly stated that "a group's electoral power is not unconstitutionally diminished by the simple fact of an apportionment scheme that makes winning elections more difficult, and a failure of proportional representation alone does not constitute impermissible discrimination under the Equal Protection Clause." *Bandemer*, 478 U.S. at 132, 106 S.Ct. 2797 (citations omitted). The *Bandemer* plurality supported this conclusion by reasoning that "[a]n individual or group of individuals who votes for a losing candidate is usually deemed to be adequately represented by the winning candidate and to have as much opportunity to influence that candidate as other voters in the district. We cannot presume

in such a situation, without actual proof to the contrary, that the candidate elected will entirely ignore the interests of those voters." *Id.*

This is unquestionably an onerous standard, difficult for a plaintiff to meet. Yet it was not unwittingly crafted. The *Bandemer* plurality, aware that it was treading on ground that the judiciary had previously declared forbidden to itself, was chary about creating a test that would allow for officious interference with the state legislatures' prerogative to create reapportionment plans. While the *Bandemer* plurality gave notice to the state legislatures that they would no longer be free to construct political gerrymanders with impunity, it recognized that reapportionment is "the most political of legislative functions," one not amenable to judicial control or correction save for the most egregious abuses of that power. *Id.* at 143, 106 S.Ct. 2797.[4]

In the matter *sub judice*, Petitioners adduced evidence showing that the number of congressional seats that Republicans are projected to win will be disproportionate to the percentage of the vote Republicans are anticipated to receive statewide. Even if we assume *arguendo* that this evidence establishes that Act 1 will effect disproportionate election results,[5] Petitioners are nonetheless not entitled to relief as they have not shown that there is a "strong indicia of lack of

4. In this court's recent decision regarding challenges to reapportionment of the Pennsylvania Legislature, three Justices expressed receptiveness to the concern that the Court should not occupy an unduly passive role in the vindication of express state constitutional requirements of compactness and integrity of political subdivisions. *See Albert v. 2001 Legislative Reapportionment Comm'n,* 567 Pa. 670, 688, 790 A.2d 989, 1000 (2002) (Saylor, J., concurring). In the present context of Congressional reapportionment, however, there are no analogous, direct textual references to such neutral apportionment criteria. Accordingly, the significance of these factors to the present equal protection and free and equal election challenges is limited by the degree to which their presence or absence would evidence intent or effects under *Bandemer.*

5. The Presiding Officers raise a host of issues challenging the admissibility of the evidence adduced by Petitioners at the hearing before Judge Pellegrini. We need not resolve these issues as we find that Petitioners' evidence, even assuming that it is all admissible, is insufficient to entitle them to relief.

political power and the denial of fair representation." *See Bandemer,* 478 U.S. at 139, 106 S.Ct. 2797. As stated *supra,* this prong of the effects test requires a plaintiff to establish that the discriminated against group has effectively been shut out of the political process. Petitioners have failed to meet this burden. First, they have not alleged in their brief to this court that a winning Republican congressional candidate "will entirely ignore the interests" of those citizens within his district who voted for the Democratic candidate. *See Bandemer,* 478 U.S. at 132, 106 S.Ct. 2797. Also, it is undisputed that at least five of the districts are "safe seats" for Democratic candidates, thus further undermining Petitioners' claim that Democrats have been entirely shut out of the political process. *See Pope,* 809 F.Supp. at 397 (the party which was allegedly discriminated against had not been shut out of the political process where it was virtually guaranteed to win some seats.)

Petitioners seem to believe that evidence of disproportionate results necessarily leads to a conclusion that there will also be a lack of political power and denial of fair representation, and that separate proof showing that the Democrats will be shut out of the political process is not necessary. In essence, Petitioners want us to collapse the two prongs of the effects test into one. This is precisely what the *Bandemer* plurality forbad, and we perceive no sound reason to ease Petitioners' burden in this respect.

Accordingly, we find that Petitioners have failed to carry their burden of establishing that Act 1 effectuates a political gerrymander in violation of the Pennsylvania Constitution, and thus deny relief on the state constitutional law claims raised in Petitioners' Petition for Review. As only the state law claims are before this court and those claims are dismissed, jurisdiction is relinquished.

Chief Justice ZAPPALA files a dissenting opinion.

Chief Justice ZAPPALA, dissenting.

I find that the General Assembly's plan violates the Equal Protection Clause of the Fourteenth Amendment to the U.S.

144

Constitution and would remand with directions to the General Assembly to reapportion the federal congressional districts. The evidence presented before the Commonwealth Court establishes that the current reapportionment plan was formulated so as to intentionally discriminate and dilute the vote of an identifiable political group and had an actual discriminatory effect on that group.[1]

Although I agree with the majority's resolution of the standing issue, I feel compelled to address the overzealous nature of the arguments made in this regard. The unusual argument has been made that Petitioners lacked standing to bring this challenge to the congressional reapportionment plan because they failed to demonstrate that they have never voted for a political candidate who was not a Democrat. It is asserted that Petitioners did not establish standing to complain on behalf of the Democratic Party for that reason.

It would come as a great surprise to registered Republicans or Democrats who have cast votes in elections for candidates who were not members of the same party that they are not "true" Republicans or Democrats, but instead some unidentifiable political group. It is suggested that a voter in this Commonwealth must always choose the candidate offered by his or her own party in order to be a "true" Republican or Democrat. No voter can fail to represent his or her party by selecting the candidate believed to be the best-suited to represent the citizens of this Commonwealth.

In the final analysis, it is the individual who possesses integrity, sound judgment and the ability to lead, rather than follow, who will truly serve his or her constituents. These qualities are not within the exclusive domain of any political party. When voting patterns are used then as the foundation

---

1. This case is distinguishable from *Albert v. 2001 Legislative Reapportionment Comm'n*, 567 Pa. 670, 790 A.2d 989 because there the challengers failed to establish the elements of political gerrymandering. The challengers in *Albert* primarily focused upon the compactness and contiguousness of their individual districts. Their claims did not object to the plan as a whole. Here, Petitioners offered sufficient evidence of the unconstitutional statewide impact of the congressional redistricting plan.

to ensure the continued success of one particular party, as here, the principles of the U.S. Constitution are defeated and we are all ill-served.

The assertion that Petitioners lack standing to enforce those constitutional principles has no support in our jurisprudence. It is claimed that Petitioners failed to establish that they have standing to pursue a political gerrymandering claim because they have failed to show individualized harm and have alleged and presented only harm to a group. It is argued that the group's interest in litigation challenging a statewide plan as a partisan gerrymander could be asserted by the Pennsylvania Democrat State Committee or its leaders.

As noted by the majority, this Court examined the principle of standing in the context of a challenge to the reapportionment of state legislative districts in *Albert*. We held that "any entity not authorized by law to exercise the right to vote in this Commonwealth lack[ed] standing to challenge the reapportionment plan." *Id.* at 995. This holding did not represent a new principle of law; instead it followed the well-established test for standing articulated by this Court in *William Penn Parking Garage, Inc. v. Pittsburgh,* 464 Pa. 168, 346 A.2d 269 (1975) and the U.S. Supreme Court's decision in 1964 in *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).

We stated in *Albert* that

it is the right to vote and the right to have one's vote counted that is the subject matter of a reapportionment challenge. Significantly, as noted by the United States Supreme Court in *Reynolds v. Sims,* "the right to vote is personal" and "the rights sought to be vindicated in a suit challenging an apportionment scheme are 'personal and individual'" 377 U.S. at 554–555, 84 S.Ct. 1362 (citing *United States v. Bathgate,* 246 U.S. 220, 227, 38 S.Ct. 269, 62 L.Ed. 676 (1916)); *South v. Peters,* 339 U.S. 276, 280, 70 S.Ct. 641, 94 L.Ed. 834 (1950).

*Id.* at 994–95.

Following the narrow framework of their view of standing, Respondents have developed their argument that Petitioners

have failed to demonstrate a violation of the Equal Protection Clause of the Fourteenth Amendment. Although this analysis would deny a registered voter the opportunity to raise a constitutional challenge on behalf of his or her political party, and limit this right to some nebulous prototype voter, this Court has not done so. Instead, we have recognized that protection is afforded to the voter, rather than to a party.

In *Davis v. Bandemer*, 478 U.S. 109, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986) (plurality opinion), the United States Supreme Court addressed an equal protection challenge to Indiana's 1981 legislative reapportionment of the state's legislative districts pursuant to the 1980 census. The appellees, several Indiana Democrats, challenged the reapportionment plan, alleging that the plan constituted a political gerrymander intended to disadvantage Democrats. A three-judge panel of the United States District Court for the Southern District of Indiana was convened to hear the claims. Elections were held under the new districting plan before the case was heard. Two years later, the divided district court issued a decision declaring the reapportionment to be unconstitutional and ordered the legislature to prepare a new plan. The United States Supreme Court reversed. A majority of the Court concluded that political gerrymandering was a justiciable question, but concluded that the district court had applied the incorrect standard in finding unconstitutional vote dilution.

The context in which the equal protection challenge arose is relevant to our discussion. Indiana's legislature consisted of 100 members of the House of Representatives and 50 members of the Senate. The reapportionment plans created 50 single member districts for the Senate; in the House of Representatives, it provided for 7 triple-member, 9 double-member, and 61 single-member districts. County and city lines were not consistently followed, although township lines generally were. Each Senate district was not divided exactly into two House districts and there was little relation between the lines drawn in the Senate and House plans.

When the elections were first held under the new districting plans, all of the House seats and half of the Senate seats were

up for election. As described by the Supreme Court, Democratic candidates received 51.9% of the vote over all the House races statewide, but only 43 Democrats were elected to the House. In two counties, which had been divided into multi-member House districts, Democratic candidates obtained 46.6% of the vote, but secured only 3 of 21 House seats. In the races for 25 senatorial seats, Democratic candidates received 53.1% of the statewide vote, resulting in the election of 13 Democrats.

The district court found support for the challengers' position in the election results and concluded that further examination of the circumstances surrounding the reapportionment was warranted. The court noted the irregular shape of district lines, the fact that multi-member districts were suspect in terms of compactness, and that district lines failed to adhere consistently to boundaries of political subdivisions.[2] The court found that explanations offered for the configuration of the districts to be inadequate.

These factors led the district court to conclude that the reapportionment plan had been drawn intentionally to favor Republican incumbents and candidates and to disadvantage Democratic voters. The court found this was achieved by "stacking" Democrats into districts with large Democratic majorities and "splitting" them in other districts so as to give Republicans safe, although not excessive, majorities in those districts. The U.S. Supreme Court described these tactics as

familiar techniques of political gerrymandering. Democratic (or Republican, as the case may be) votes are "stacked" and "wasted" by creating districts where Democrats form majorities much greater than the 50% necessary to carry those districts. Concurrently, Republican votes are spread among districts in which they form safe, perhaps 55% majorities, and Democratic votes are "cracked" or "split" by dispersing them in such a way as to be ineffectual.

2. The district court's analysis of these factors is reflective of the type of analysis undertaken by this Court in addressing challenges to the state reapportionment plan in *Albert,* supra.

478 U.S. at 117, n. 6, 106 S.Ct. 2797. The district court invalidated the reapportionment plan, finding that the plan had a discriminatory effect in that the proportionate voting influence of Democratic voters had been adversely affected.

Part II of the U.S. Supreme Court's opinion, which was authored by Justice White and joined by five other Justices, addressed the question of whether the case presented a justiciable controversy or a nonjusticiable political question. In addressing that issue, Justice White observed that

> Since *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), we have consistently adjudicated equal protection claims in the legislative districting context regarding inequalities in population between districts. In the course of these cases, we have developed and enforced the "one person, one vote" principle. See, *e.g. Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).

478 U.S. at 118, 106 S.Ct. 2797.

Justice White further explained that "in formulating the one person, one vote formula, the Court characterized the question posed by election districts of disparate size as an issue of fair representation."

> In such cases, it is not that anyone is deprived of a vote or that any person's vote is not counted. Rather, it is that one electoral district elects a single representative and another district of the same size elects two or more—the elector's vote in the former district having less weight in the sense that he may vote for and his district be represented by only one legislator, while his neighbor in the adjoining district votes for and is represented by two or more.

*Id.* at 123, 106 S.Ct. 2797. "Since the achieving of fair and effective representation for all citizens is concededly the basic aim of legislative apportionment, we conclude that the Equal Protection Clause guarantees the opportunity for equal participation by all voters in the election of State legislators." *Id.* at 123–24, 106 S.Ct. 2797 (citation omitted).

He noted that challenges premised upon political gerrymandering differ from those based upon claims that districts of disparate size violated the equal protection clause, stating that

[n]ot only does everyone have the right to vote and to have his vote counted, but each elector may vote for and be represented by the same number of lawmakers. *Rather, the claim is that each political group in a State should have the same chance to elect representatives of its choice as any other political group.* Nevertheless, the issue is one of representation, and we decline to hold that such claims are never justiciable.

*Id.* at 124, 106 S.Ct. 2797 (emphasis added).

The Court concluded that the fact that the claim was brought by a political group, rather than a racial group or a group claiming that a reapportionment plan diluted the weight of votes because of place of residence, simply did not justify a refusal to entertain such a claim. "That the characteristics of the complaining group are not immutable or that the group has not been subject to the same historical stigma may be relevant to the manner in which the case is adjudicated." *Id.* at 125, 106 S.Ct. 2797.

Having determined that the appellees had presented a justiciable claim, the Court then discussed whether the district court had erred in holding that the appellees had alleged and proved a violation of the equal protection clause. Part III of Justice White's opinion, however, garnered only three other votes.[3] The Court was unable to reach a consensus on the issue of what a claimant must prove in order to establish vote dilution in this context. Discussion of the plurality's analysis is necessary, however, to illustrate the Court's perceived failings in the appellees' presentation of their equal protection claim.

The Court agreed with the district court that in order to succeed the appellees were required to prove both intentional discrimination against an identifiable political group and an

3. Justices Brennan, Marshall and Blackmun joined Part III of Justice White's opinion.

actual discriminatory effect on that group. The Court declined to overturn the district court's finding of discriminatory intent as clearly erroneous, finding that the record presented would support a finding that the discrimination was intentional. Acknowledging the political realities of districting and apportionment, and that "[t]he political profile of a State, its party registration, and voting records are available precinct by precinct, ward by ward", the Court observed that "[a]s long as redistricting is done by a legislature, it should not be very difficult to prove that the likely political consequences of the reapportionment were intended." *Id.* at 129, 106 S.Ct. 2797 (footnote omitted).[4]

The Court found, however, that appellees had failed to establish a sufficiently adverse effect on their constitutionally protected rights under the equal protection clause. The district court had identified the political group suffering discrimination as those voters who voted for Democratic Assembly candidates in Indiana's 1981 election and relied primarily on the results of that single election to meet the requirements of a political gerrymandering claim.[5] The Court concluded that relying upon a single election to prove unconstitutional discrimination was unsatisfactory. The Court stated,

> The District Court did not find that because of the 1981 Act the Democrats could not in one of the next few elections secure a sufficient vote to take control of the assembly. Indeed, the District Court declined to hold that the 1982 election results were the predictable consequences of the 1981 Act and expressly refused to hold that those results were a reliable prediction of future ones. The District Court did not ask by what percentage the statewide Democratic vote would have had to increase to control either the House

---

4. The court cautioned, however, that the fact that intentional discrimination may not be difficult to demonstrate did not relieve a challenger of the burden of proof.

5. As noted above, in that election Republican candidates received 48.1% of the votes cast statewide for the House of Representatives, but won 57 of the 100 seats to be filled. As for the Senate, Republican candidates received 46.9% of the votes cast statewide, but won 12 of the 25 seats to be filled.

or the Senate. The appellants argue here, without a persuasive response from the appellees, that had the Democratic candidates received an additional few percentage points of the votes cast statewide, they would have obtained a majority of the seats in both houses. *Nor was there any finding that the 1981 reapportionment would consign the Democrats to a minority status in the Assembly throughout the 1980's or that the Democrats would have no hope of doing any better in the reapportionment that would occur after the 1990 census.* Without findings of this nature, the District Court erred in concluding that the 1981 Act violated the Equal Protection Clause.

*Id.* at 135–36, 106 S.Ct. 2797 (emphasis added).

The Court determined that the appellees had failed to demonstrate that there had been an unconstitutional discrimination against members of the Democratic party by premising their claim solely upon the results of a single election. "[A] mere lack of proportionate results in one election cannot suffice in this regard." *Id.* at 139, 106 S.Ct. 2797. Equal protection violations will be found only where a history (actual or projected) of disproportionate results appears in conjunction with strong indicia of lack of political power and the denial of fair representation. *Id.* at 139–40, 106 S.Ct. 2797.

The Court was not indifferent, however, to the fact that discriminatory effects need not be suffered first before an equal protection claim could be brought. *"Projected* election results based on district boundaries and past voting patterns may certainly support this type of claim even where *no* election has yet been held under the challenged districting." *Id.* at 140 n. 17, 106 S.Ct. 2797.

The case before us stands in stark contrast to *Bandemer.* Petitioners here have amply demonstrated that the reapportionment plan improperly diluted the votes of Democrats in violation of the equal protection clause. As required by the *Bandemer* court, Petitioners have established that the reapportionment plan was intentionally drawn so as to deprive the influence of Democratic voters on the political process as a

whole. They have demonstrated also that the plan effectively secures an advantage to Republican candidates of 13–6 or 14–5 in the Pennsylvania congressional delegation. The continual succession of Republican candidates is also achieved by the reasonable likelihood that they will prevail in 2002 and beyond.

Undisputedly, an equal protection challenge will not be sustained merely because particular candidates may not win in any given election. The U.S. Constitution was not designed to promote particular campaigns. What is at stake, and what is entitled to protection, is more sacred. It is the fundamental principle that we are governed by democracy and not oligarchy.

When that fundamental principle is disregarded, as in this case, we have lost more than the representation of a Republican or Democratic elected official in the United States Congress.

Here, Respondents have focused on whether individual voters may be adequately represented by any winning candidate. They have ignored, however, the more significant inquiry posed by the U.S. Supreme Court. The issue is not whether any elected official has the ability to represent his or her constituent. No election, and no constitution, can guarantee any voter capable representation.

The issue is whether the reapportionment plan has denied voters of a fair chance to influence the political process. This inquiry focuses not on the effects of a single election, but on the election process itself. It is when this inquiry is undertaken that the constitutional flaws of this reapportionment plan are revealed.

The following findings of fact made by Judge Dante Pellegrini of the Commonwealth Court demonstrate a violation of the equal protection clause of the Fourteenth Amendment:

**Hearing Evidence**

36. At the hearing, Petitioners presented evidence from six witnesses, including two sitting members of Congress, one member of the Pennsylvania General Assembly, and two

expert witnesses. Respondents chose to present no witnesses, but did enter into the record evidence of voter registration totals in the districts created by Act 1.

37. Registered Democrat voters in Pennsylvania frequently "split" their votes among the candidates of various parties and "cross-over" to vote for Republican candidates. Tr. at 35 (Hoeffel); Tr. at 103 (Mascara); Tr. at 196 (Ceisler); *see* Proposed Findings of Fact 16–19.35.

38. The Pennsylvania Democrat party, according to Petitioners' witnesses, consists of "people who hold office in the Democratic party, people who aspire to hold office in the Democratic party, Democrats who have Democratic party ideals and vote Democratic." Tr. at 195 (Ceisler).

39. In Pennsylvania, only registered Democrat voters can sign nominating petitions and vote for those seeking to be nominated as the Democrat candidate for public office. Section 802 of the Pennsylvania Election Code, Act of June 3, 1937, P.L. 1333, *as amended,* 25 P.S. § 2832.

40. Registered Republican voters in Pennsylvania frequently "split" their votes among the candidates of various parties and "cross-over" to vote for Democrat candidates. Tr. at 194 (Ceisler); *see* Proposed Findings of Fact 16–19.

41. Dr. David Lublin, an Assistant Professor of Government at American University and an expert in voting rights, redistricting and the statistical study of elections and redistricting plans, testified for Petitioners concerning the likely partisan effect of Act 1. Exh. 37; Tr. at 51:6–52:11 (Lublin).

42. In analyzing Act 1, Dr. Lublin used voting data from 19 prior statewide elections—including all of the federal statewide elections and all statewide executive office races from 1990s—to analyze how the people in Act 1's districts would have voted under a variety of electoral conditions. Exhs. 39, 44, 56; Tr. at 54:13–55:11 (Lublin). Through this technique of "reaggregating" elections from the 1990s, Dr. Lublin was able to determine how particular districts in Act 1 lean (*i.e.*, Republican or Democratic) and whether particular incumbents are likely to be re-elected. Tr. 54:15–56:12 (Lublin).

43. To determine which way districts lean, Professor Lublin computed an average of votes on a district-by-district basis and then determined how many districts performed above or below that average for a party.

44. To determine whether a particular incumbent was likely to be re-elected, Dr. Lublin also looked at the districting plan that was in effect throughout the 1990s. For those incumbents who have historically won in districts that lean against the incumbent's party, Dr. Lublin assumed they would continue to win if the district did not change very much. Tr. at 55:19–56:12 (Lublin).

45. Petitioners also presented the testimony of Mr. Larry Ceisler, a political consultant and expert in Pennsylvania politics. Mr. Ceisler used his experience and knowledge of Pennsylvania and past elections to explain the likely impact of Act 1 as well as the impetus behind its passage. Tr. at 157:15–160:22, 165–03–04, 165:19–167:22, 168:08–19, 170:24–171:23; 173:24–174:15, 175:17–176:10, 176:20–177:12, 192:07–11 (Ceisler).

### The Effect of Act 1 on Party Membership on the Congressional Delegation

46. Act 1, the congressional redistricting plan passed by the General Assembly in January 2002 and signed into law by the Governor, creates only five or six districts that Democrats are likely to win out of 19, giving Republicans a 13–6 or 14–5 likely advantage in the Pennsylvania congressional delegation—even if they receive less than half the votes cast, in which case there is a reasonable likelihood that Republican candidates will be able to prevail in 2002 and beyond.[6]

47. Act 1 pairs two incumbent Democratic Congressmen into District 13, Congressmen Hoeffel and Borski. Exh. 7; Tr. at 18:14–18:16 (Hoeffel). Congressman Hoeffel testified that it is highly probable that Congressman Borski would

6. Paragraph 46 reflects the amended finding of fact submitted by Judge Pellegrini. The amendment deleted a typographical error in the original submission of his findings of fact.

defeat him in the Democratic primary but he would lose the general election to a moderate Republican from the Montgomery County portion of District 13. About 53 percent of the 13th District's population live in Montgomery County and about 47 percent live in Philadelphia. Tr. at 19:7–19:19 (Hoeffel). Indeed, Melissa Brown, a Republican from Montgomery County, has already announced her intention to run. Tr. at 19:20–20:13 (Hoeffel). Brown, who is pro-choice, would likely defeat the pro-life Congressman Borski. Tr. at 166:07–167:22 (Ceisler).

48. Under Act 1, Congressman Holden, a Democrat, who is paired in the 17th District with Congressman Gekas, a Republican, is likely to be defeated in a seat that strongly favors the Republican. Exh. 6; Tr. at 21:15–21:18 (Hoeffel). Act 1 also pairs Democratic Congressmen Doyle and Coyne; Coyne has indicated he will retire.

49. Congressman Mascara is not paired with an incumbent, but Act 1 places him in a radically reconfigured district which heavily favors a specific Republican challenger—State Senator Tim Murphy. Tr. at 97:24–99:09, 109:15–23 (Mascara).

50. Act 1 congressional districts have wide disparities in the proportion of constituents that Democratic and Republican incumbents retain from their old districts.

51. The congressional districts drawn by Act 1 was for the purpose and intent to elect more Republican members to Congress than Democrats. See, e.g., Exhs. 6, 39, 40, 48, 50; Tr. at 53:10–15, 64:14–68:10 (Lublin); 165:03–04 (Ceisler).

### District Lines

52. Under Act 1, lines were drawn using census tracts rather than precincts, i.e., voting or election districts. Act 1 splits six election precincts or voting districts into multiple congressional districts, doubling the number of precinct splits in the 1992 plan. Act 1; Exh. 56 at 25, 28.

53. Act 1's District 6 is an irregular, "dragon-shaped" district that covers three counties in southeast Pennsylvania

and includes several wholly distinct, unconnected communities of interest. Exh. 7; Tr. at 16:9–16:24 (Hoeffel). District 6 is centered in rural Chester County, extends deeply into Berks County, and then comes into Montgomery County at Limerick Township just below Pottstown, includes the borough of Pottstown itself, swings to the east and then down towards the south through the center of Montgomery County to pick up the county seat of Norristown and Lower Merion Township. Exh. 7; Tr. at 16:9–16:24 (Hoeffel). In so doing, District 6 combines the relatively unrelated rural parts of Chester and Berks County with the "densely settled suburban" communities of Norristown, Plymouth, Lower Merion and Narberth in Montgomery County. Exh. 7; Tr. at 16:18–16:24 (Hoeffel).

54. Act 1 divides up western Pennsylvania as can best be seen by the jagged and irregular line between Districts 12 and 18.

55. Act 1's districts are significantly less compact than under prior plans in Pennsylvania. Professor Lublin analyzed compactness using two separate measures—"Perimeter Measure" and "Dispersion Measure"—that are generally accepted in Professor Lublin's field and widely used in redistricting cases. Exh. 42; Tr. at 78:12–78:15 (Lublin). Using Professor Lublin's "Perimeter Measure Analysis," four of Act 1's districts-Districts 1, 6, 12 and 18, are less compact than the least compact district under the 1992 plan. Exh. 42. On average, Act 1's districts are less compact than those in prior decades. Exh. 42; Tr. at 80:1–5 (Lublin).

56. Act 1 divides 65 municipalities in comparison with only 13 municipal splits in the 1992–2001 map, a fivefold increase. Tr. at 177:04–12 (Ceisler). Petitioners' Alternate Plans 1 and 2 split only 18 municipalities. Tr. at 177:04–19 (Ceisler). District 12 by itself splits more than 20 townships. Exh. 6. Act 1 also splits 25 counties into multiple districts, up from 18 county splits under the 1992 plan. Exh. 6; Exh. 56, at 25–27.

As the U.S. Supreme Court observed, "the question is whether a particular group has been unconstitutionally denied

its chance to effectively influence the political process." *Bandemer*, 478 U.S. at 132–33, 106 S.Ct. 2797. The record reveals that the answer is yes. If the record of this case does not establish unconstitutional political gerrymandering, no such claim exists. This Court should not then waste its valuable judicial resources entertaining illusory claims that, in reality, can never be established.

Thus, I dissent.

## ORDER

AND NOW, this 8th day of February, 2002, it is hereby Ordered that the attached Amended Recommended Findings of Fact and Conclusions of Law be filed in the above-captioned case.

### APPENDIX A

### AMENDED RECOMMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Paragraph 46 of the Recommended Findings of Fact is amended to read:

46. Act 1, the congressional redistricting plan passed by the General Assembly in January 2002 and signed into law by the Governor, creates only five or six districts that Democrats are likely to win out of 19, giving Republicans a 13–6 or 14–5 likely advantage in the Pennsylvania congressional delegation—even if they receive less than half the votes cast, in which case there is a reasonable likelihood that Republican candidates will be able to prevail in 2002 and beyond.

Respectfully submitted,

DAN PELLEGRINI, JUDGE

Commonwealth Court of Pennsylvania

### RECOMMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

On January 10, 2002, JoAnn Erfer and Jeffrey Albert ("Petitioners") filed a Petition for Review in the Nature of a

Complaint for Declaratory and Injunctive Relief ("Petition") in the Commonwealth Court of Pennsylvania challenging Act No. 2002–1 ("Act 1"). This statute puts into place 19 congressional districts in accordance with the results of the 2000 Census. Named as Respondents were the Commonwealth; the Governor of Pennsylvania, Mark Schweiker; Secretary of the Commonwealth, Kim Pizzingrilli; Commissioner of the Bureau of Commissions, Elections and Legislation of the Pennsylvania Department of State, Richard Filling (collectively, the "Commonwealth"); Lieutenant Governor Robert Jubelirer and Speaker of the House of Representatives Matthew Ryan ("Presiding Officers").

Petitioners allege that Act 1 violates certain constitutional rights under the United States Constitution. As to federal constitutional rights violated, it contends that Act 1 denies or abridges their "right to vote for their Representative to the United States Congress," in violation of U.S. CONST. art. I, § 2, and amendment XIV, § 2 and U.S. CONST. art. I, § 4 (Claim I); denies them "equal protection of the laws as guaranteed to them by the Equal Protection Clause" of amendment XIV, § 1 (Claim II); "constitutes an abridgment of the privileges and immunities of citizenship guaranteed to [them] by the Privilege or Immunities Clause" of amendment XIV, § 1 (Claim III); denies or abridges their "right to free association" as guaranteed to them by amendment I (Claim IV); and "constitute[s] a violation of" 42 U.S.C. § 1983 (Claim V).

Under the Pennsylvania Constitution, they contend that Act 1 denies or abridges their rights "as equally free and independent citizens" under PA. CONST. art. I, § 1 (Claim VI); denies or abridges their right "to a free and equal election" under PA. CONST. art. I, § 5 (Claim VII); discriminates against them in their "exercise of their civil rights" in violation of PA. CONST. art I., § 26 (Claim VIII); and violates their rights "to assemble together for their common good" and their right to freedom of speech in violation of PA. CONST. art. I, §§ 7 & 20 (Claim IX).

On January 11, 2002, Petitioners asked Commonwealth Court to expedite consideration of the case and on January 16, 2002, Presiding Officers filed preliminary objections to the Petition. Commonwealth Court ordered an expedited briefing schedule for the preliminary objections with arguments to be held before Commonwealth Court *en banc* on March 13, 2002.

On January 25, 2002, Petitioners applied to the Supreme Court of Pennsylvania, asking it to assume plenary jurisdiction of the state constitutional claims (Claims VI–IX) under 42 Pa.C.S. § 726 and to expedite consideration. The Supreme Court responded with the following order:

> AND NOW, this 29th day of January, 2002, Petitioners' request that this court exercise plenary jurisdiction over this matter is GRANTED. The matter is REMANDED to the Commonwealth Court for expedited consideration. The Commonwealth Court is to limit its consideration of the matter to the state constitutional claim[s] raised by Petitioners in their Petition for Review that they filed with the Commonwealth Court on January 10, 2002 that is docketed at 10 M.D. 2002. The Commonwealth Court is directed to file its findings of fact and conclusions of law with this court no later than NOON on February 8, 2002.

Order dated 1/29/02 in Dkt. No. 14 MM 2002. By order the same day, a hearing was scheduled for Friday, February 1, 2002.

Also on January 29, 2002, Respondents filed an application to withdraw their preliminary objections, and simultaneously therewith, filed an Answer with New Matter to the Petition and a Third–Party Petition for Review in the Nature of a Complaint for Declaratory Relief, naming as third-party Respondents Richard & Norma Jean Veith and Susan Furey.

A hearing was held on February 1, 2002. Petitioners called six witnesses: Congressman Joseph Hoeffel, Professor David Lublin, Congressman Frank Mascara, Larry Sparr (Director of Elections for Washington County), Representative William DeWeese (Minority Leader of the House), and Larry Ceisler (a paid partisan consultant & media political pundit).

160

The following exhibits of Petitioners were admitted over objection. The maps titled by Petitioners as "Conference Committee Plan" are the final maps enacted by Act 1.

Exhibit 1 Map: U.S. Congressional Districts 1992–2001.

Exhibit 2 Map: U.S. Congressional Districts 1992–2201—Greater Southeast.

Exhibit 6 Map: 2001 Congressional Reapportionment Conference Committee Plan.

Exhibit 7 Map: 2001 Conference Committee Plan—Southeast Pa.

Exhibit 9 Map: 12th & 18th Congressional District—Conference Committee.

Exhibit 11 Map: 2001 Conference Committee Plan, Philadelphia County.

Exhibit 39 Chart: Percentage of the Republican Vote Needed for GOP to Win Seats Based on Statewide Election Results.

Exhibit 40 Graph: Percent of Votes to Elect 14 Republicans (1992) or 13 Republicans (Proposed Plan).

Exhibit 42 Chart: Compactness.

Exhibit 43 Graph: Percent Constituents Retained by Plan and Party.

Exhibit 44 Chart: Percentage of Districts with Above Average Republican Strength.

Exhibit 45 Graph: Average Share of Districts with Above Average GOP Statewide Vote Strength Based on Major-Party Vote.

Exhibit 47 Chart: Treatment of Incumbents: 1st Alternative Plan.

Exhibit 48 Chart: Treatment of Incumbents: Conference Plan.

Exhibit 49 Chart: Treatment of Incumbents: 2nd Alternative Plan.

Exhibit 50 Graph: Estimated Percent Republican Seats.

Exhibit 51 Chart: Partisan Characteristics of Districts: 1st Alternative Plan.

Exhibit 52 Chart: Partisan Characteristics of Districts: Conference Plan.

Exhibit 53 Chart: Partisan Characteristics of Districts: 1992 Plan.

Exhibit 54 Chart: Partisan Characteristics of Districts: 2nd Alternative Plan.

Exhibit 56 Untitled [Compilation of data].

The following stipulated exhibits were also admitted: Petitioners' Exhibit 37 (Resume of Dr. David Lublin) and Respondents' Exhibit 1 (Table: Voter Registration with New 2001 Congressional Districts). The following Petitioners' exhibits were admitted solely as "maps" (*see* Tr. at 204):

Exhibit 13 Map: 2001 Congressional Reapportionment 1st Alternative Plan.

Exhibit 17 Map: 2001 Congressional Reapportionment 2nd Alternative Plan.

Exhibit 55: Map: 2001 Congressional Reapportionment 3rd Alternative Plan.

Findings based on those maps were made together with Exhibit 56.

Because the Supreme Court had assumed plenary jurisdiction and could remand if it found the record was inadequate for it to make a decision, where challenges were made to evidence and where possible, discretion was exercised in favor of admitting evidence and testimony. Judicial notice has also been taken of certain information that has been attached as an Appendix to Presiding Officers' brief and not introduced at trial.

On February 6, 2002, Petitioners filed an Application to Supplement the Record on the issue of standing which, on February 7, 2002, was denied.

### Recommended Findings of Fact

1. Petitioners are JoAnn Erfer or Jeffrey B. Allen who are individuals with standing to maintain this action.

162

2. Respondents are the Commonwealth of Pennsylvania, Mark Schweiker, Governor of Pennsylvania; Kim Pizzingrilli, Secretary of the Commonwealth; Richard Filling, Commissioner of the Bureau of Commissions, Elections, and Legislation of the Pennsylvania Department of State; Robert C. Jubelirer, Lieutenant Governor and President of the Senate of Pennsylvania; and Matthew J. Ryan, Speaker of the House of Representatives of Pennsylvania.

## Background

3. When congressional seats were reapportioned after the 2000 Census, Pennsylvania lost two seats, dropping from 21 to 19. *See* Section 1 of Act 1 (noting that the Commonwealth was to be divided into 19 congressional districts); *Mellow v. Mitchell*, 530 Pa. 44, 607 A.2d 204 (1992) (Appendix A, dividing the Commonwealth into 21 districts); Tr. at 20 (Hoeffel) (noting that Act 1 "represents 19 seats down from our current 21").

4. Under the 1990 Census, Pennsylvania's total population was 11,881,643, making the "ideal" population for each of Pennsylvania's 21 congressional seats 565,792 or 565,793. *See Mellow v. Mitchell*, 530 Pa. 44, 607 A.2d 204 (1992) (Appendix A).

5. Under the 2000 Census, Pennsylvania's total population was 12,281,054, making the "ideal" population for each of Pennsylvania's 19 congressional districts 646,371 or 646,372. *See* THE PENNSYLVANIA MANUAL, *Local Government* (115th edition.) (available on the Pennsylvania Department of State website at *www.dgs.state.pa.us/PAManual/home.htm*). (Appendix ("App.") Tab D contains copies of all data obtained from the Local Government section of the 115th edition of THE PENNSYLVANIA MANUAL).

6. The total population in Philadelphia decreased from 1,585,577 in 1990 to 1,517,550 in 2000. *See* THE PENNSYLVANIA MANUAL, *Local Government* (115th ed.) (App. Tab D).

7. The total population in Allegheny County decreased from 1,336,449 in 1990 to 1,281,666 in 2000, and the population of

the City of Pittsburgh decreased from 369,879 in 1990 to 334,563 in 2000. *See* THE PENNSYLVANIA MANUAL, *Local Government* (115th ed. 2001) (App. Tab D); THE PENNSYLVANIA MANUAL *Local Government* (114th ed. 1999) (App. Tab F).

8. Between 1990 and 2000, significant population growth occurred in the counties surrounding Philadelphia (Chester, Montgomery, Delaware & Bucks), and the Pocono Region (Monroe, Pike & Wayne) as the following chart shows:

| County | 1990 Population | 2000 Population |
|---|---|---|
| Bucks | 541,174 | 597,635 |
| Chester | 376,396 | 433,501 |
| Delaware | 547,651 | 550,864 |
| Monroe | 95,709 | 138,687 |
| Montgomery | 678,111 | 750,097 |
| Pike | 27,966 | 46,302 |
| Wayne | 39,944 | 47,722 |

THE PENNSYLVANIA MANUAL, *Local Government* (115th ed.) (App. Tab D).

9. As of 2001, Pennsylvania has 67 counties and 2,569 cities, townships and boroughs. *See* THE PENNSYLVANIA MANUAL, *Local Government* (115th ed.) (App. Tab D).

10. Official voter registration data for November 2000 shows there were 7,781,997 registered voters in Pennsylvania: 3,250,-764 (41.8%) Republicans; 3,736,304 (48.0%) Democrats; 7,918 (00.1%) Constitution; 30,248 (00.4%) Libertarian; 756,763 (09.7%) Other. *See* Certification No. 2002–11b, Office of the Secretary of the Commonwealth (App. Tab G).

11. Official voter registration data for November 2001 shows there were 7,773,403 registered voters in Pennsylvania: 3,233,-171 (41.6%) Republicans; 3,733,766 (48.0%) Democrats; 3,268 (00.04%) Green; 803,198 (10.3%) Other. *See* Certification No. 2002–11b, Office of Secretary of the Commonwealth (App. Tab G).

12. Currently (elected in 2000 under the 1992 court-ordered congressional redistricting plan), there are 11 Republicans and

164

10 Democrats in Pennsylvania's congressional delegation. *See* THE PENNSYLVANIA MANUAL, *Federal Government* (115th ed.) (App. Tab H).

13.   Under the 1992 court-ordered congressional redistricting plan, Montgomery County was split among five congressional districts with the majority in the 13th district. *See Mellow v. Mitchell,* 530 Pa. 44, 607 A.2d 204 (1992) (Appendix A).

14.   Under the 1992 court-ordered congressional redistricting plan (based on the legal description), 16 counties were split, 12 municipalities (cities, townships and boroughs) were split, 4 wards were split. Three of the above municipalities were split at the census block level. *See Mellow v. Mitchell,* 530 Pa. 44, 607 A.2d 204 (1992) (Appendix A).

15.   Congressman William Coyne (Democrat) representing the 14th district located in Allegheny County, has announced he will not seek reelection. Tr. at 70 (Lublin) and App. Tab H.

16.   There were two statewide elections in 1998—U.S. Senator and Governor. In the election for U.S. Senator, of the 2,957,499 votes cast, the Republican candidate received 1,814,-180 (61.3%), the Democrat candidate received 1,028,839 (34.8%), and the two other candidates received 114,480 (3.9%) of the votes. In the election for Governor, of the 3,024,941 votes cast, the Republican candidate received 1,736,844 (57.4%), the Democrat candidate received 938,745 (31.0%), and the other candidate received 349,352 (11.5%) of the votes. Certification No. 2002–10b, Office of the Secretary of the Commonwealth (App. Tab I).

17.   In the only statewide race in 1999 (Superior Court Judge), of the 4,023,279 total votes cast (two positions were open), the two Republican candidates received a total of 2,075,561 (51.6%) and the two Democrat candidates received a total of 1,947,718 (48.4%) (one Republican and one Democrat were elected). Certification No. 2002–10b, Office of the Secretary of the Commonwealth (App. Tab I).

18. There were five statewide races in 2000 (President, U.S. Senator, Attorney General, Auditor General, State Treasurer). The following chart shows the results:

| | Total Votes Cast | Republican Candidate | Democrat Candidate | Other Candidate |
|---|---|---|---|---|
| President | 4,912,185 | Election | 2,485,967 (50.6%) | 145,091 (3.0%) |
| U.S. Senator | 4,735,116 | 2,481,962 (52.4%) | 2,154,908 (45.5%) | 98,246 (2.1%) |
| Attorney General | 4,619,438 | 2,495,253 (54.0%) | 1,991,144 (43.1%) | 133,041 (2.9%) |
| Auditor General | 4,664,541 | 1,862,934 (39.9%) | 2,651,551 (56.9%) | 150,056 (3.2%) |
| State Treasurer | 4,680,934 | 2,307,422 (49.3%) | 2,211,471 (47.2%) | 162,041 (3.5%) |

Certification No. 2002–10b, Office of the Secretary of the Commonwealth (App. Tab I).

19. There were seven statewide races in 2001 (Supreme Court Justice, three Commonwealth Court Judges, three Superior Court Judges). The following chart shows the results (all seven Republican candidates won):

| Election | Total Votes Cast | Republican Candidate(s) | Democrat Candidate(s) | Other Candidate |
|---|---|---|---|---|
| Supreme Court | 2,005,422 | 1,051,360 (52.4%) | 954,062 (47.6%) | 0 |
| Commonwealth Court | 5,275,158 | 2,839,610 (53.8%) | 2,435,548 (46.2%) | 0 |
| Superior Court | 5,376,773 | 2,899,151 (53.9%) | 2,477,622 (46.1%) | 0 |

Certification No. 2002–10b, Office of the Secretary of the Commonwealth (App. Tab I).

### Enactment of Act No. 2002–1

20. Senate Bill 1200 was introduced on November 16, 2001. *See* Legislative History of SB 1200 (available, along with all versions of SB 1200 through the Electronic Bill Room on the General Assembly's website (*www.le gis.state.pa.us/WUOI/LI/BI/billroom.htm* )) (App. Tab A).

21. Congressman Joseph Hoeffel (D) testified before the Joint Hearing of the Senate and House State Government Committees on redistricting on November 27, 2001. Tr. at 29–30 (Hoeffel).

22. Congressman Frank Mascara (D) submitted written testimony to the Joint Hearing of the Senate and House State Government Committees on redistricting on November 28, 2001. Tr. at 116 (Mascara).

23. On December 10, 2001, the Senate passed SB 1200, PN 1531, which provided the legal descriptions for 19 congressional districts. Legislative History of SB 1200 (App. Tab A); SB 1200, PN 1531.

24. During debate in the Senate, a member of the Democrat Caucus offered A4552 as an amendment to SB 1200. *See* LEGISLATIVE JOURNAL—SENATE (Dec. 10, 2001) at 42–44 (App. Tab J). The amendment was defeated 27–22. *Id.*

25. The Senate declined to concur in the House amendment to SB 1200. *See* Legislative History of SB 1200 (App. Tab A).

26. The Senate and the House each appointed three members as conferees to a conference committee on SB 1200; the conferees for the House were Reps. Smith, Barley and Veon and the conferees for the Senate were Senators Brightbill, Piccola and Mellow. *See* Legislative History. Rep. DeWeese was not a conferee. Tr. at 149 (DeWeese).

27. On January 2, 2002, the Conference Committee reported a version agreed to by four of the six members (Reps. Smith and Barley and Senators Brightbill and Piccola). *See* SB 1200, PN 1645 (App. Tab B).

28. On January 3, 2002, the Senate, after debate, passed the Conference Committee Report on SB 1200 by a 28–22 vote. *See* Legislative History of SB 1200 (App. Tab A).

29. On January 3, 2002, the House, after debate, passed the Conference Committee Report on SB 1200 by a 139–52 vote, with 42 Democrats voting in favor of the bill. *See* Legislative History of SB 1200 (App. Tab A) and Tr. at 31–32, 107–08, 149–50.

30. Forty-two of the 98 members of the Democrat Caucus of the House of Representatives voted in favor of Act 1. Tr. at 149–150 (DeWeese). Without the vote of the 42 House Democrats, Act 1 would not have passed. *See* PA. CONST. art. II, § 10 (102 votes are needed for final passage); Proposed Finding of Fact 29 (final vote was 132–59).

After certification by the Presiding Officers of the Senate and House, SB 1200 was forwarded to Governor Schweiker,

who, on January 7, 2002, signed SB 1200 into law as Act No. 2002–1 ("Act 1"). *See* Certified Copy of the Act 1 (App. Tab C); *see also* Legislative History of SB 1200 (App. Tab A).

## The Effect of Act 1

30.  Of the 19 districts put in place under Act 1, voter registration figures for the districts as of 2000 show that seven have a majority Republican registration and seven have a majority Democrat registration. Of the remaining five districts, three have a plurality Republican registration and two have a plurality Democrat registration. Respondents' Ex. 1. The chart below shows the actual registration figures and percentages for each of the 19 districts:

| Congressional District | Republican Registration | Democrat Registration | Other |
|---|---|---|---|
| 1 | 83,648 (19.69%) | 314,219 (73.96%) | 26,967 (6.35%) |
| 2 | 62,564 (13.65%) | 360,599 (78.65%) | 35,312 (7.70%) |
| 3 | 171,435 (44.05%) | 182,454 (46.89%) | 35,263 (9.06%) |
| 4 | 168,115 (38.55%) | 225,631 (51.74%) | 42,353 (9.71%) |
| 5 | 190,842 (50.88%) | 145,735 (38.86%) | 38,481 (10.26%) |
| 6 | 209,105 (49.87%) | 150,634 (35.92%) | 59,600 (14.21%) |
| 7 | 279,835 (62.03%) | 119,762 (26.55%) | 51,547 (11.42%) |
| 8 | 208,392 (48.75%) | 160,289 (37.50%) | 58,791 (13.75%) |
| 9 | 190,087 (52.90%) | 137,561 (38.28%) | 31,714 (8.82%) |
| 10 | 198,012 (52.06%) | 147,823 (38.86%) | 34,520 (9.08%) |
| 11 | 135,536 (34.92%) | 217,168 (55.96%) | 35,389 (9.12%) |
| 12 | 107,919 (27.30%) | 259,845 (65.74%) | 27,513 (6.96%) |
| 13 | 209,502 (47.79%) | 187,967 (42.88%) | 40,882 (9.33%) |
| 14 | 78,419 (17.31%) | 335,317 (74.04%) | 39,173 (8.65%) |
| 15 | 164,599 (41.98%) | 174,188 (44.43%) | 53,273 (13.59%) |
| 16 | 214,334 (57.52%) | 106,083 (28.47%) | 52,213 (14.01%) |
| 17 | 203,089 (52.87%) | 141,621 (36.86%) | 39,443 (10.27%) |
| 18 | 167,683 (37.05%) | 242,385 (53.55%) | 42,544 (9.40%) |
| 19 | 207,675 (54.11%) | 126,830 (33.04%) | 49,318 (12.85%) |

31.  Under Act 1, Montgomery County is split among six congressional districts with the largest portion in the 13th district. *See* Section 1 of Act 1 (Legal Description). Under the court-ordered 1992 plan, Montgomery County was split among five congressional districts.

32.  Under Act 1, there are five congressional districts in which it is safe to assume an incumbent Democrat congressman will win re-election (if the incumbent runs) in 2002. The five congressmen are Reps. Murtha, Kanjorski, Fattah, Brady and Doyle. Tr. at 22 (Hoeffel); Tr. at 165, 179, 189 (Ceisler).

33. Under Act 1, there is a district (District 6) in which no incumbent resides. Tr. at 18 (Hoeffel).

34. Congresswoman Melissa Hart (District 4), a Republican, currently represents a district with a majority of registered Democrat voters, see Tr. 38 (Hoeffel). Under Act 1, District 4 continues to have a majority of registered Democrat voters (51.7% Democrat to 38.5% Republican). Respondents' Ex. 1.

## Hearing Evidence

36. At the hearing, Petitioners presented evidence from six witnesses, including two sitting members of Congress, one member of the Pennsylvania General Assembly, and two expert witnesses. Respondents chose to present no witnesses, but did enter into the record evidence of voter registration totals in the districts created by Act 1.

37. Registered Democrat voters in Pennsylvania frequently "split" their votes among the candidates of various parties and "cross-over" to vote for Republican candidates. Tr. at 35 (Hoeffel); Tr. at 103 (Mascara); Tr. at 196 (Ceisler); see Proposed Findings of Fact 16–19.35.

38. The Pennsylvania Democrat party, according to Petitioners' witness, consists of "people who hold office in the Democratic party, people who aspire to hold office in the Democratic party, Democrats who have Democratic party ideals and vote Democratic." Tr. at 195 (Ceisler).

39. In Pennsylvania, only registered Democrat voters can sign nominating petitions and vote for those seeking to be nominated as the Democrat candidate for public office. Section 802 of the Pennsylvania Election Code, Act of June 3, 1937, P.L. 1333, as amended, 25 P.S. § 2832.

40. Registered Republican voters in Pennsylvania frequently "split" their votes among the candidates of various parties and "cross-over" to vote for Democrat candidates. Tr. at 194 (Ceisler); see Proposed Findings of Fact 16–19.

41. Dr. David Lublin, an Assistant Professor of Government at American University and an expert in voting rights, redis-

tricting and the statistical study of elections and redistricting plans, testified for Petitioners concerning the likely partisan effect of Act 1. Exh. 37; Tr. at 51:6–52:11 (Lublin).

42.   In analyzing Act 1, Dr. Lublin used voting data from 19 prior statewide elections—including all of the federal statewide elections and all statewide executive office races from the 1990s—to analyze how the people in Act 1's districts would have voted under a variety of electoral conditions.   Exhs. 39, 44. 56; Tr. at 54:13–55:11 (Lublin).   Through this technique of "reaggregating" elections from the 1990s, Dr. Lublin was able to determine how particular districts in Act 1 lean (*i.e.,* Republican or Democratic) and whether particular incumbents are likely to be re-elected.   Tr. 54:15–56:12 (Lublin).

43.   To determine which way districts lean, Professor Lublin computed an average of votes on a district-by-district basis and then determined how many districts performed above or below that average for a party.

44.   To determine whether a particular incumbent was likely to be re-elected, Dr. Lublin also looked at the districting plan that was in effect throughout the 1990s.   For those incumbents who have historically won in districts that lean against the incumbent's party, Dr. Lublin assumed they would continue to win if the district did not change very much.   Tr. at 55:19–56:12 (Lublin).

45.   Petitioners also presented the testimony of Mr. Larry Ceisler, a political consultant and expert in Pennsylvania politics.   Mr. Ceisler used his experience and knowledge of Pennsylvania and past elections to explain the likely impact of Act 1 as well as the impetus behind its passage.   Tr. at 157:15–160:22,  165:03–04,  165:19–167:22,  168:08–19,  170:24–171:23;  173:24–174:15, 175:17–176:10, 176:20–177:12, 192:07–11 (Ceisler).

### The Effect of Act 1 on Party Membership
### on the Congressional Delegation

46.   Act 1, the congressional redistricting plan passed by the General Assembly in January 2002 and signed into law by the

Governor, creates only five or six districts that Democrats are likely to win out of 19, giving Republicans a 13–6 or 14–5 likely advantage in the Pennsylvania congressional delegation—even if they receive less than half the votes cast, in which case there is a reasonable likelihood that Democratic candidates will be able to prevail in 2002 and beyond.

47. Act 1 pairs two incumbent Democratic Congressmen into District 13, Congressmen Hoeffel and Borski. Exh. 7; Tr. at 18:14–18:16 (Hoeffel). Congressman Hoeffel testified that it is highly probable that Congressman Borski would defeat him in the Democratic primary but he would lose the general election to a moderate Republican from the Montgomery County portion of District 13. About 53 percent of the 13th District's population live in Montgomery County and about 47 percent live in Philadelphia. Tr. at 19:7–19:19 (Hoeffel). Indeed, Melissa Brown, a Republican from Montgomery County, has already announced her intention to run. Tr. at 19:20–20:13 (Hoeffel). Brown, who is pro-choice, would likely defeat the pro-life Congressman Borski. Tr. at 166:07–167:22 (Ceisler).

48. Under Act 1, Congressman Holden, a Democrat, who is paired in the 17th District with Congressman Gekas, a Republican, is likely to be defeated in a seat that strongly favors the Republican. Exh. 6; Tr. at 21:15–21:18 (Hoeffel). Act 1 also pairs Democratic Congressmen Doyle and Coyne; Coyne has indicated he will retire.

49. Congressman Mascara is not paired with an incumbent, but Act 1 places him in a radically reconfigured district which heavily favors a specific Republican challenger—State Senator Tim Murphy. Tr. at 97:24–99:09, 109:15–23 (Mascara).

50. Act 1 congressional districts have wide disparities in the proportion of constituents that Democratic and Republican incumbents retain from their old districts.

51. The congressional districts drawn by Act 1 was for the purpose and intent to elect more Republican members to Congress than Democrats. See, e.g., Exhs. 6, 39, 40, 48, 50; Tr. at 53:10–15, 64:14–68:10 (Lublin); 165:03–04 (Ceisler).

## District Lines

52.   Under Act 1, lines were drawn using census tracts rather than precincts, i.e., voting or election districts. Act 1 splits six election precincts or voting districts into multiple congressional districts, doubling the number of precinct splits in the 1992 plan. Act 1; Exh. 56 at 25, 28.

53.   Act 1's District 6 is an irregular, "dragon-shaped" district that covers three counties in southeast Pennsylvania and includes several wholly distinct, unconnected communities of interest. Exh. 7; Tr. at 16:9–16:24 (Hoeffel). District 6 is centered in rural Chester County, extends deeply into Berks County, and then comes into Montgomery County at Limerick Township just below Pottstown, includes the borough of Pottstown itself, swings to the east and then down towards the south through the center of Montgomery County to pick up the county seat of Norristown and Lower Merion Township. Exh. 7; Tr. at 16:9–16:24 (Hoeffel). In so doing, District 6 combines the relatively unrelated rural parts of Chester and Berks County with the "densely settled suburban" communities of Norristown, Plymouth, Lower Merion and Narberth in Montgomery County. Exh. 7; Tr. at 16:18–16:24 (Hoeffel).

54.   Act 1 divides up western Pennsylvania as can best be seen by the jagged and irregular line between Districts 12 and 18.

55.   Act 1's districts are significantly less compact than under prior plans in Pennsylvania. Professor Lublin analyzed compactness using two separate measures—"Perimeter Measure" and "Dispersion Measure"—that are generally accepted in Professor Lublin's field and widely used in redistricting cases. Exh. 42; Tr. at 78:12–78:15 (Lublin). Using Professor Lublin's "Perimeter Measure Analysis," four of Act 1's districts— Districts 1, 6, 12 and 18, are less compact than the least compact district under the 1992 plan. Exh. 42. On average, Act 1's districts are less compact than those in prior decades. Exh. 42; Tr. at 80:1–5 (Lublin).

56.   Act 1 divides 65 municipalities in comparison with only 13 municipal splits in the 1992–2001 map, a fivefold increase. Tr.

at 177:04–12 (Ceisler). Petitioners' Alternate Plans 1 and 2 split only 18 municipalities. Tr. at 177:04–19 (Ceisler). District 12 by itself splits more than 20 townships. Exh. 6. Act 1 also splits 25 counties into multiple districts, up from 18 county splits under the 1992 plan. Exh. 6; Exh. 56, at 25–27.

## Alternate Plans

57. Petitioners submitted into evidence three alternative redistricting plans to highlight the bias in Act 1. Exhs. 13, 17, 55. Exhibits 13, 17 and 55 are labeled alternative plans 1, 2 and 3, respectively.

58. None the alternative plans were before the General Assembly. Tr. at 80 (Petitioners' counsel). *See* Exhibits 13, 17 and 55. Petitioners' Exhibit 56 is composed of all the data on which Dr. Lublin relied, including data on compactness, population deviation, electoral results, etc. Exh. 56, Tr. at 80:9–13 (Lublin). All data used by Dr. Lublin was derived from the General Assembly through the House Minority Demographics office. Tr. at 55:8–55:11 (Lublin). All conclusions are based on the accuracy of Exh. 56, at 19, 21, 22.

59. Alternate Plans 1 and 2 split no precincts. Exh. 56, at 21–24, 29–32. Splitting election precincts will cause problems "for ballot tabulation, counting and casting." Tr. at 125:5–127:12, 128:14–128:18 (Spahr).

60. Both Alternate Plans 1 and 2 would likely result in a 10–9 Republican advantage in Pennsylvania's congressional delegation. Exhs. 47, 49, 50; Tr. at 53:15–19, 73:21–74:8 (Lublin); Tr. at 177:20–25 (Ceisler). Alternates 1 and 2 would pair one set of Democrats and one set of Republicans. Tr. at 179:10–16 (Ceisler). Each eliminates one incumbent Democrat and one incumbent Republican. Exh. 13; 22:22–23:17 (Hoeffel).

61. Alternate Plans 1 and 2 also have more compact districts on average than Act 1. Exh. 42; Tr. at 80:1–5 (Lublin). Alternate Plans 1 and 2 split fewer counties and municipalities than Act 1. Plaintiffs' 1st Alternate Plan splits 24 counties, 18 municipalities, 0 precincts. Exh. 56, at 29–30. Plaintiffs' 2nd

Alternate Plan splits 23 counties, 18 municipalities, 0 precincts. Exh. 56, at 31–32.

62. Plaintiffs' 1st Alternate Plan has a maximum population deviation of 19 people (646,361 people in District 7, 646,380 people in District 8). Exh. 56, at 21. Plaintiffs' 2nd Alternate Plan has a maximum population deviation of 15 people (646,-365 people in District 14, 646,380 people in Districts 16 and 19). Exh. 56, at 23.

## CONCLUSIONS OF LAW

1. Because the Commonwealth has withdrawn its preliminary objections, it has waived the issue of Petitioners' standing. Pa. R.C.P. No. 1019; *In Re: Estate of Alexander,* 758 A.2d 182 (Pa.Super.Ct.2000). Presiding Officers still have outstanding preliminary objections, including one addressing standing, and until those preliminary objections are heard, Petitioners are presumed to have standing for the purpose of this proceeding.

2. Petitioners bear the burden of proving that Act 1 is unconstitutional. *Singer v. Sheppard,* 464 Pa. 387, 346 A.2d 897 (1975); *In re Ross Township Election District Reapportionment,* 88 Pa.Cmwlth. 233, 489 A.2d 297 (1985). There is a presumption in favor of constitutionality and "all doubt is to be resolved in favor of sustaining the legislation." *Id.* (quoting *Milk Control Commission v. Battista,* 413 Pa. 652, 659, 198 A.2d 840, 843 (1964)). "An Act of Assembly will not be declared unconstitutional unless it *clearly, palpably* and *plainly* violates the Constitution." *Singer,* 464 at 393, 346 A.2d at 900 (quoting *Daly v. Hemphill,* 411 Pa. 263, 271, 191 A.2d 835, 840 (1963)) (emphasis added). The standard is no different when the challenge is to a redistricting plan. *In re Ross Township Election District Reapportionment,* 88 Pa.Cmwlth. 233, 489 A.2d 297 (1985), *aff'd.,* 514 Pa. 41, 522 A.2d 553 (1987).

3. Article 1, Section 4, Clause 1 of the United States Constitution provides that, "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof: ....."

4. Article 2, § 16 of the Pennsylvania Constitution provides for the reapportionment of the General Assembly. It states that:

The Commonwealth shall be divided into fifty senatorial and two hundred three representative districts, which shall be composed of compact and contiguous territory as nearly equal in population as practicable. Each senatorial district shall elect one Senator, and each representative district one Representative. Unless absolutely necessary no county, city, incorporated town, borough, township or ward shall be divided in forming either a senatorial or representative district.

5. Article 2, § 11 of the Pennsylvania Constitution requires and provides for the reapportionment of local municipalities, providing:

Within the year following that in which the Federal decennial census is officially reported as required by Federal law, and at such other times as the governing body of any municipality shall deem necessary, each municipality having a governing body not entirely elected at large shall be reapportioned, by its governing body or as shall otherwise be provided by uniform law, into districts which shall be composed of compact and contiguous territory as nearly equal in population as practicable, for the purpose of describing the districts for those not elected at large.

6. While 19 states have adopted state constitutional provisions regulating Congressional reapportionment, at least one of which mandated districts that were "contiguous and compact," see *Brown v. Saunders*, 159 Va. 28, 166 S.E. 105 (1932) (discussion of Section 55 of the Virginia Constitution), there is no Pennsylvania constitutional provision specifically dealing with Congressional reapportionment.

7. Although the General Assembly derives its authority over congressional redistricting from the U.S. Constitution, and there is no express state constitutional provision regulating congressional reapportionment, it does not follow that any other applicable provisions of the Pennsylvania Constitution

would not be controlling on the Pennsylvania General Assembly. The General Assembly is created by the Pennsylvania Constitution and is bound by its provisions. To find otherwise would mean that the 19 State Constitutions that have specific constitutional provisions would not be binding on their legislatures.

8. Article 1, § 5 of the Pennsylvania Constitution provides that:

Elections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage.

9. In the context of a challenge to reapportionment by the General Assembly, Article 1, § 5 of the Pennsylvania Constitution, has been interpreted as follows:

Elections are free and equal within the meaning of the Constitution when they are public and open to all qualified electors alike; when every voter has the same right as any other voter; when each voter under the law has the right to cast his ballot and have it honestly counted; when the regulation of the right to exercise the franchise does not deny the franchise itself, ... and when no constitutional right of the qualified elector is subverted or denied him.

*In re 1991 Pennsylvania Legislative Reapportionment Commission,* 530 Pa. 335, 356, 609 A.2d 132, 142 (1992), quoting from *City Council of City of Bethlehem v. Marcincin,* 512 Pa. 1, 8, 515 A.2d 1320, 1322 (1986) (quoting *Shankey v. Staisey,* 436 Pa. 65, 69, 257 A.2d 897, 898 (1969), *cert. denied,* 396 U.S. 1038, 90 S.Ct. 684, 24 L.Ed.2d 682 (1970)).

10. In *In re 1991 Pennsylvania Legislative Reapportionment Commission,* our Supreme Court addressed a claim of political gerrymandering, a claim of deprivation of free and equal elections, and a violation of equal protection under the state constitutional provisions at issue here and the 14th Amendment to the United States Constitution. Without making a separate analysis for each issue, it found determinative of all the state and federal constitutional claims the three-prong test set forth by the Supreme Court of the United

States in *Davis v. Bandemer,* 478 U.S. 109, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986). That analysis requires that the plaintiff establish:

1. intentional discrimination against an identifiable political group;
2. an actual discriminating effect on that group; and
3. a history of disproportionate results appear[ing] in conjunction with strong indicia of lack of political power and the denial of fair representation.

In adopting the *Bandemer* analysis, the Pennsylvania Supreme Court went on to state that, "[t]his Court is persuaded by the holding of the Supreme Court of the United States with regard to the elements of a prima facie case of political gerrymandering." *In re 1991 Pennsylvania Legislative Reapportionment Commission,* 530 Pa. at 355, 609 A.2d at 142.

11. No Pennsylvania cases have addressed whether Article 1, § 5 of the Pennsylvania Constitution applies to congressional redistricting processes. It appears that in order to make out a violation of Article 1, § 5 within the context of congressional redistricting, the same elements that must be shown for a violation under the equal protection clause of the Fourteenth Amendment and Article 1, §§ 1 & 26 of the Pennsylvania Constitution must be met. *In re 1991 Pennsylvania Legislative Reapportionment Commission.*

12. Article 1, § 26 of the Pennsylvania Constitution provides:

Neither the Commonwealth nor any political subdivision thereof shall deny to any person the enjoyment of any civil right, nor discriminate against any person in the exercise of any civil right.

13. Article 1, § 1 of the Pennsylvania Constitution provides that:

All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness.

14. Article 1, §§ 1 & 26, together, constitute an equal protection guarantee. *See Love v. Borough of Stroudsburg,* 528 Pa. 320, 597 A.2d 1137 (1991). The guarantee promises protection at least as strong as the Equal Protection Clause of the United States Constitution's Fourteenth Amendment. If Act 1 violates the Fourteenth Amendment's Equal Protection Clause, it *a fortiori* violates Pennsylvania's equal protection guarantee.

15. Partisan gerrymandering cases in congressional redistricting are justiciable under the Pennsylvania Constitution. *In re 1991 Pennsylvania Legislative Reapportionment Com'n.*

16. Petitioners contend that their rights under Article 1, § 5 to a free and equal election and Article 1, §§ 1 & 26 to equal protection guaranteed by the Pennsylvania Constitution have been violated because:

- There is no justification for the nineteen vote disparity between Congressional districts. Act 1 violates the constitutional requirement of "one-person—one vote."

- Pennsylvania elections should be structured in such a way that when parties demonstrate equal levels of public support, Congressional Districts must be reapportioned in such a way so as to demonstrate a rough correlation between that support and the number of seats that each party receives. Because Act 1 allows Republican congressional candidates to gather fewer than half of the votes but more than twice—and perhaps nearly three times—as many seats as Democrats, petitioners argue that Act 1 is outside any margin of error that the Free and Equal Elections clause can be interpreted to permit.

17. The nineteen vote disparity does not violate the one-person-one vote requirement because the deviation is *de minimus.* In *In re Pennsylvania Legislative Reapportionment Commission,* 609 A.2d at 147 (Pa.1992), our Supreme Court noted that it has approved legislative reapportionment total percentage deviations from ideal district population of:

|      | Senate | House |
|------|--------|-------|
| 1991 | 1.87%  | 4.94% |
| 1981 | 1.93%  | 2.81% |
| 1971 | 4.31%  | 5.45% |

18. Even assuming that justification for such a *de minimus* difference was needed, the splitting of municipal boundaries would not be a factor in showing a lack of justification because, unlike for legislative reapportionment, there is no requirement that municipal boundaries be taken into consideration in a Congressional Reapportionment. Moreover, Petitioners failed to meet its burden that the deviation is not justified and that some deviation is unavoidable, no matter what the plan, because census districts, let alone voting districts, are not equal in population.

19. No court has addressed what should be considered an identifiable political group but "as a threshold matter, plaintiffs must show that they are members of an identifiable political group whose voting strength has been diluted. They must first prove that they belong to a politically salient class...", *Karcher v. Daggett*, 462 U.S. 725, 754, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983) (Stevens, J., concurring), and identify with at least some degree of specificity, what group has been denied an effective vote. *See Shaw v. Reno*, 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993).

20. Because out of the 19 districts created under Act 1, seven have a majority Republican registration and seven have a majority Democrat registration, and of the remaining five districts, three have a plurality Republican registration and two have a plurality Democrat registration, Petitioners make no claim that voters registered as Democrats have been discriminated against. But they do claim that because of ticket splitting, census tracts, in which voters that are registered in one party often ticket split to vote another way or on an issue, have been amalgamated in such a way to give Republicans the advantage.

21. Voters who are likely to vote Democratic (or Republican) in a particular district though not registered Democrats (or Republicans) based on the candidates or issues are not an identifiable political salient class necessary to establish a violation under Article 1, § 5 and Article 1, §§ 1 & 26 of the Pennsylvania Constitution. *See* Conclusion of Law 10 & 19.

22. While the congressional districts were drawn to give Republican candidates and Republican incumbents an advantage through a sophisticated analysis of voting trends, matching of issues, matching of potential candidates and residency of candidates, none of that conduct discriminates against any identifiable political group. Because they have not shown that the rights of any identifiable political group have been violated, Petitioners have failed to set forth a cause of action that Article 1, § 5 and Article 1, §§ 1 & 26 of the Pennsylvania Constitution have been violated.

23. Art. 1, § 7 of the Pennsylvania Constitution provides:

The printing press shall be free to every person who may undertake to examine the proceedings of the Legislature or any branch of government, and no law shall ever be made to restrain the right thereof. The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty. No conviction shall be had in any prosecution for the publication of papers relating to the official conduct of officers or men in public capacity, or to any other matter proper for public investigation or information, where the fact that such publication was not maliciously or negligently made shall be established to the satisfaction of the jury; and in all indictments for libels the jury shall have the right to determine the law and the facts, under the direction of the court, as in other cases.

24. Petitioners have failed to propose any findings or conclusion regarding Article 1, § 7 and, in any event, the Petition fails to state a claim for which relief can be granted on this claim.

25. Article 1, § 20 of the Pennsylvania Constitution provides that:

The citizens have a right in a peaceable manner to assemble together for their common good, and to apply to those invested with the powers of government for redress of

grievances or other proper purposes, by petition, address or remonstrance.

26. Petitioners have failed to propose any findings or conclusion regarding Article 1, § 20, and, in any event, the Petition fails to state a claim for which relief can be granted on this claim.

27. Because Petitioners have failed to make out a claim that any provision of the Pennsylvania Constitution has been violated, their Petition should be dismissed.

Respectfully submitted,

DAN PELLEGRINI, JUDGE

COMMONWEALTH COURT OF PENNSYLVANIA

### AMENDED RECOMMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Paragraph 5 of the Recommended Conclusions of Law is amended to read:

5. Article 9, § 11 of the Pennsylvania Constitution requires and provides for the reapportionment of local municipalities, providing:

> Within the year following that in which the Federal decennial census is officially reported as required by Federal law, and at such other times as the governing body of any municipality shall deem necessary, each municipality having a governing body not entirely elected at large shall be reapportioned, by its governing body or as shall otherwise be provided by uniform law, into districts which shall be composed of compact and contiguous territory as nearly equal in population as practicable, for the purpose of describing the districts for those not elected at large.

Respectfully submitted,

DAN PELLEGRINI, JUDGE

Commonwealth Court of Pennsylvania