## In re CANVASS OF ABSENTEE BALLOTS OF NOVEMBER 4, 2003 GENERAL ELECTION.

**Appeal of John PIERCE, Thomas Stepnick and Susan Gantman and Susan Gantman for Superior Court, Inc.**

**In Re Canvass of Absentee Ballots of November 4, 2003 General Election.**

**Appeal of John Pierce, Thomas Stepnick and Susan Gantman and Susan Gantman for Superior Court, Inc.**

Commonwealth Court of Pennsylvania.

Argued Dec. 18, 2003.
Decided Dec. 22, 2003.
As Amended Jan. 12, 2004.

Ronald L. Hicks, Jr., Pittsburgh, for appellants.

Clifford B. Levine, Pittsburgh, for appellees.

BEFORE: COLINS, President Judge, McGINLEY, Judge, SMITH–RIBNER, Judge, PELLEGRINI, Judge, FRIEDMAN, Judge, LEADBETTER, Judge, and SIMPSON, Judge.

OPINION BY Judge PELLEGRINI.

This opinion is issued as a result of our order dated December 18, 2003, in which we denied the appeal of John Pierce (Pierce), Thomas Stepnick (Stepnick), Susan Gantman (Gantman) and Susan Gantman for Superior Court, Inc. (Campaign Committee) (collectively, Objectors) from an order of the Court of Common Pleas of Allegheny County (trial court) reversing the decision of the Allegheny County Elections Board (Elections Board) and allowing 74 challenged third-party hand-delivered absentee ballots to be counted in the November 4, 2003, statewide General Election.

This case involves the November 4, 2003 statewide General Election that was recently held in Allegheny County, Pennsylvania, and addresses the issue of whether non-disabled voters who voted by absentee ballots and had those ballots delivered by third parties to the county election boards could have their ballots counted in that election. Under Section 1306 of the Election Code,[1] 25 P.S. § 3146.6(a), absentee ballots must be delivered in person by the non-disabled voter to the Elections Board.[2] There is no provision for the delivery of a non-disabled absentee voter's ballot by any one other than the absentee voter. Section 1306 provides in relevant part:

(a) At any time after receiving an official absentee ballot, but on or before five o'clock P.M. on the Friday prior to the primary or election, the elector shall, in secret, proceed to mark the ballot only in black lead pencil, indelible pencil or blue, black or blue-black ink, in fountain pen or ball point pen, and then fold the ballot, enclose and securely seal the same in the envelope on which is printed, stamped or endorsed "Official Absentee Ballot." This envelope shall then be placed in the second one, on which is printed the form of declaration of the elector, and the address of the elector's county board of election and the local election district of the elector. The elector shall then fill out, date and sign the declaration printed on such envelope. Such envelope shall then be securely sealed and the elector shall send same by mail, postage prepaid, except where franked, or **deliver it in person to said county board of election:** ...

25 P.S. § 3146.6(a) (Emphasis added.)

Despite the fact that the Election Code makes no provision for third-party deliveries of absentee ballots by voters, it has been the past practice of the Elections Board to allow third-party deliveries of absentee ballots. Regarding the then upcoming November 4, 2003 election, Pierce and Stepnick, members of the Republican Committee, submitted a letter to the Elections Board objecting to this practice and requesting that Section 1306 be strictly

---

1. Act of June 3, 1937, P.L. 1333, *as amended.*

2. Section 1302(e) of the Election Code, 25 P.S. § 3146.2(e), discusses absentee ballot voting procedures for voters who are qualified bedridden or hospitalized veterans or unable to attend a polling place on the day of election due to an illness or physical disability. Section 1306.1 of the Election Code, 25 P.S.

§ 3146.6(a), provides the assistance a disabled person may receive in filling out the ballot. Neither provision deals with how the ballot must be delivered. Presumably, 25 P.S. § 3146.6(a) also applies to disabled/ill voters and the procedure on how their ballots must be delivered.

construed. On October 22, 2003, the Chairman of the Elections Board directed that the Elections Division refuse absentee ballots delivered by persons other than the absentee voters themselves, and the record indicates that this policy was strictly enforced between October 22, 2003 and October 27, 2003.

However, on October 27, 2003, the Elections Board conducted a hearing to reconsider the Chairman's decision. Present at the hearing were members of both the Republican Committee and the Democratic State Committee. The Elections Board decided to once again allow third-party deliveries of absentee ballots for non-disabled voters for the four days remaining for such delivery before the election and issued a directive indicating the change in voting procedure. However, it required that any person delivering another's absentee ballot would have to show photo identification and sign a form certifying that he or she was authorized by the voter to deliver the ballot, had maintained custody of the ballot and that the ballot had not been tampered with. From October 27, 2003 through October 31, 2003, the Elections Division received 936 hand-delivered ballots of which 97 were absolutely determined to be delivered by third parties for

absentee voters. It was not known how many, if any, of the remaining ballots were delivered by third parties. On October 31, 2003, Pierce and Stepnick sought review of the Elections Board's October 27, 2003 decision in federal court.[3]

On November 4, 2003, the statewide General Election was held in the Commonwealth of Pennsylvania. Pierce and Stepnick, who were registered voters in Allegheny County, Pennsylvania, were also Republican candidates in that election running for the offices of Allegheny County Treasurer and Register of Wills, respectively. As a result of the federal lawsuit they commenced prior to the election, a temporary restraining order was entered by the United States District Court for the Western District of Pennsylvania ordering that 937 hand-delivered absentee ballots in the election were to remain segregated by the Elections Board because they were deemed "challenged" under Pennsylvania law, and that a hearing was to be held regarding those challenged ballots.

On November 10, 2003, the Elections Board sent a notice to the voters whose absentee ballots were being challenged that it was holding a hearing on November

---

**3.** In the lawsuit filed in the United States District Court for the Western District of Pennsylvania, *Pierce and Stepnick v. Allegheny County Board of Elections*, Civil Action No. 03–1677, Pierce and Stepnick alleged that their constitutional and statutory rights had been violated as a result of practices and/or policies by the Elections Board in allowing non-disabled voters who were expected to be absent from their municipalities during the November 4, 2003 election to have their completed absentee ballots hand-delivered by persons other than themselves in contravention of Section 1306 of the Election Code, 25 P.S. § 3146.6(a). They requested that the Elections Board be enjoined from permitting such delivery, that it be required to set aside such ballots, and that it be enjoined from delivering such ballots to the local precincts in order

to prevent the commingling of such ballots with other legitimately cast absentee ballots. Following a hearing on November 3, 2003, Federal Court Judge Conti abstained from considering issues arising under the Election Code, but found that Pierce and Stepnick had stated viable claims for violations of their right to vote and to have their vote weighted equally pursuant to the equal protection clause of the Fourteenth Amendment and for violations of the Election Code. She then issued a temporary restraining order that the 937 hand-delivered absentee ballots remain segregated by the Elections Board. Additionally, she declared that the 937 ballots were deemed "challenged" and that Pierce and Stepnick were entitled to a hearing in accordance with Section 1308(e) of the Election Code, 25 P.S. § 3146.8(e).

14, 2003, regarding those challenged ballots.[4] The notice stated that it was not a requirement that the absentee voters appear at the hearing. The challenged ballots fell into two groups: 351 pre-October 27th absentee ballots which were not allowed to be delivered by third parties and 54 post-October 27th absentee ballots which were allowed to be delivered by third parties. Of the 351 pre-October 27th absentee ballots, the Elections Board sustained only four challenges based on the testimony of those four voters who admitted that third parties delivered their absentee ballots at their requests. The Elections Board also sustained challenges to all 52 ballots that were delivered by third parties post-October 27th. Finally, two of the votes that the federal court had ordered sequestered were inadvertently delivered to voting districts and, following proper procedures, they were opened and commingled with 16 valid absentee ballots. Because the Elections Board determined that it was impossible to determine which two votes were subject to the federal court order, it, *sua sponte*, invalidated all 18 ballots. In total, 74 qualified voters were disenfranchised.

Pierce and Stepnick filed an appeal with the trial court from the Elections Board's decision arguing that it erred in denying their challenge as to the absentee ballot of Ronald Rydzak of Shaler Ward 7, Precinct 2. They contended that it was undisputed that Mr. Rydzak did not personally deliver

his absentee ballot as required, but instead used the Allegheny County's inter-office mail system where he worked to have his ballot delivered from his office in the Allegheny County Courthouse to the Elections Division's officer in the County Office Building. The Democratic State Committee of Pennsylvania filed a cross-appeal arguing that the Elections Board failed to abide by its own determination of October 27, 2003, resulting in the illegal disenfranchisement of eligible voters. Pierce and Stepnick filed "preliminary objections" to that appeal arguing that it lacked standing as an "aggrieved person." The Honorable John J. Driscoll (Judge Driscoll), a Democratic candidate for the Superior Court on the November 4, 2003 ballot, and Carol Krupski, M.D. (Dr. Krupski), a qualified voter whose absentee ballot was disallowed, filed an untimely joint petition to intervene—six days after the two-day appeal period passed. Gantman, a Republican candidate for Superior Court on the November 4, 2003 ballot, and her Campaign Committee also filed a petition to intervene.

The trial court overruled the "preliminary objections," granted the intervention petitions, and reversed the Elections Board's decision. After first stating that the right to vote was the most treasured prerogative of citizenship and that no voter should be disenfranchised absent compelling reasons, the trial court then found that the voters who attempted to comply

---

4. The notice stated the following:
   Dear Absentee Voter:
   Your absentee ballot for the Tuesday, November 4, 2003 Municipal Election was hand-delivered, either by you or a third person. *As a result, your ballot has not yet been opened and counted.* Pursuant to a Federal Court Order in the case of *Pierce, et al v. Allegheny County Board of Elections,* your ballot is being held in the Elections Division and is deemed "challenged." By law, a hearing must be held on the challenge, to determine if your ballot and the means of delivery, are legal. Your challenge hearing is scheduled for Friday, November 14, 2003 at 11:30 AM in Conference Room # 1, 1st Floor, Allegheny County Courthouse, 436 Grant St., Pittsburgh, PA 15219. **You are invited to attend but are not required to do so. You will be informed, in writing, of the decision of the Board of Elections and whether or not your ballot will be opened and counted.**

with the Elections Board's directive and then were penalized for doing so were not to be precluded from having their votes counted. Regarding Mr. Rydzak's absentee ballot, the trial court, agreeing with the Elections Board, allowed the vote to stand because there was no showing of fraud. This appeal by Objectors followed.

Objectors initially contend that the Democratic State Committee lacks standing to appeal the Elections Board's decision to the trial court because a political party is not an "aggrieved person." They direct our attention to Section 1407 of the Election Code which provides:

> Any **person aggrieved** by any order or decision of any county board regarding the computation or canvassing of the returns of any primary or election, or regarding any recount or recanvass thereof under sections 1701, 1702 and 1703 of this act, may appeal therefrom within two days after such order or decision shall have been made, whether then reduced to writing or not, to the court of common pleas of the proper county, setting forth why he feels that an injustice has been done, and praying for such order as will give him relief.

25 P.S. § 3157(a). (Emphasis added.) *See also* Section 1308(e) of the Election Code, 25 P.S. § 3146.8(e).

■ In support of their contention that a political party is not an "aggrieved person," Objectors cite to our Supreme Court's decision in *Erfer v. Commonwealth*, 568 Pa. 128, 794 A.2d 325 (2002), where it specifically addressed the Democratic State Committee's argument that it had standing to challenge a redistricting plan based on political gerrymandering because only political parties and not individual voters could effectively raise such claims. The Court first noted that for a party to be aggrieved, it had to have: 1) a substantial interest in the subject matter of the litigation; 2) the party's interest must be direct; and 3) the interest must be immediate and not a remote consequence of the action. Citing *Albert v. 2001 Legislative Reapportionment Commission*, 567 Pa. 670, 679, 790 A.2d 989, 995 (2002), the Court stated that "any entity not authorized by law to exercise the right to vote in this Commonwealth lacks standing to challenge the reapportionment plan," and then denied the Democratic State Committee standing to assert a challenge. However, unlike *Erfer* and *Albert* which dealt with the issue of reapportionment, i.e., whether each vote shall have equal weight, this case deals with the right of political parties and, in this instance, the Election Code has a specific provision that provides political bodies, such as the Democratic State Committee, with standing to become involved in the process of challenging votes or the disallowing of votes. Section 310 of the Election Code provides the following:

> (a) Any party or political body or body of citizens which now is, or hereafter may be, entitled to have watchers at any registration, primary or election, shall also be entitled to appoint watchers who are qualified electors of the county or attorneys to represent such party or political body or body of citizens at any public session or sessions of the county board of elections, and at any computation and canvassing of returns of any primary or election and recount of ballots or recanvass of voting machines under the provisions of this act. Such watchers or attorneys may exercise the same rights as watchers at registration and polling places, but the number who may be present at any one time may be limited by the county board to not more than three for each party, political body or body of citizens.

*  *  *

(c) Any candidate, attorney or watcher present at any recount of ballots or recanvass of voting machines shall be entitled to examine the ballots, or the voting machine and to raise any objections regarding the same, which shall be decided by the county board, subject to appeal, in the manner provided by this act. 25 P.S. § 2650. Under this section, the Democratic State Committee is a political body because it has the power to appoint watchers to insure the integrity of the voting process; therefore, it has the right to raise objections to the allowance or disallowance of votes, including the right to be present when the envelopes containing the official absentee ballots are opened, counted and recorded.[5] *See* Section 1308(b) of the Election Code, 25 P.S. § 1346.8(b).[6] Watchers do not have independent standing; they are agents for the political body that appoints them. If the ballots had been disallowed, the Democratic State Committee could raise objections to discrepancies that its watchers found at the polling places. Because of the status given in this regard to political bodies, under the Election Code, the Democratic State Committee has standing. If it did not have standing to make a challenge·one way or the other, the right to appoint watchers would be meaningless. This is so, especially when considering the two-day time period for appealing that only organized political bodies could possibly meet. Consequently, political bodies are given standing to appeal a decision of the Elections Board regarding the allowance or disallowance of votes.[7]

As to the merits, Objectors argue that the trial court erred by reversing the Elec-

---

**5.** Pursuant to Section 1308 of the Election Code, 25 P.S. § 3146.8(a), absentee ballots are counted as follows:

The county boards of election, upon receipt of official absentee ballots in such envelopes, shall safely keep the same in sealed or locked containers until they distribute same to the appropriate local election districts in a manner prescribed by the Secretary of the Commonwealth.

The county board of elections shall then distribute the absentee ballots, unopened, to the absentee voter's respective election district concurrently with the distribution of the other election supplies. Absentee ballots shall be canvassed immediately and continuously without interruption until completed after the close of the polls on the day of the election in each election district. The results of the canvass of the absentee ballots shall then be included in and returned to the county board with the returns of that district. No absentee ballot shall be counted which is received in the office of the county board of elections later than five o'clock P.M. on the Friday immediately preceding the primary or November election.

**6.** 25 P.S. § 3146.8(b) provides "[w]atchers shall be permitted to be present when the envelopes containing official absentee ballots are opened and when such ballots are counted and recorded."

**7.** Objectors also argue that the trial court erred by granting intervenor status to Judge Driscoll and Dr. Krupski and allowing them to join the appeal with the Democratic State Committee because they did not file their intervention petition until November 20, 2003, six days after the two-day appeal period set forth in Section 1407 of the Election Code. Certainly Judge Driscoll, as a candidate, and Dr. Krupski, as an elector whose vote had been disallowed, had a sufficient interest in the outcome of the appeal to permit intervention. The real question, though, is whether they can appeal outside the appeal period. Dr. Krupski did not even receive the notice that her vote had been disallowed within the two-day period for taking the appeal, making it impossible to appeal the adverse determination. Fortunately, whether due process requires that a *nunc pro tunc* appeal be granted to Dr. Krupski or Judge Driscoll because the statute provides insufficient time for them to take an appeal need not be addressed because we have found that the Democratic State Party has standing and is allowed to intervene as parties.

tions Board's decision invalidating the 74 absentee ballots because Section 1306 of the Election Code, 25 P.S. § 3146.6(a), specifies that delivery of an absentee ballot must be made by the voter himself "in person." The trial court, however, counted the 74 votes based on the following precedents that "elevate the right to vote to the highest right of citizenship:"

> The right to vote is the most treasured prerogative of citizenship in this nation and this Commonwealth. *In Re Recount of Ballots Cast in General Election,* 457 Pa. 279, 325 A.2d 303, 308 (1974). No voter is to be disenfranchised except for compelling reasons. *Appeal of Gallagher,* 351 Pa. 451, 41 A.2d 630, 632 (1945). Technicalities should not be used to make the right of the voter insecure. No construction of a statute should be indulged that would disenfranchise any voter if the law is reasonably susceptible of any other meaning. *Appeal of James,* 377 Pa. 405, 105 A.2d 64, 66 (1954). The power to throw out a ballot thus should be only used sparingly. *Weiskerger Appeal,* 447 Pa. 418, 290 A.2d 108, 109 (1972). Our goal must be to enfranchise and not to disenfranchise. *Id.* at 109.

(Trial court opinion at 5.) The trial court found that even though the statute required delivery by the voter him/herself, 74 voters were wrongly disenfranchised based on the Elections Board's actions finding the following:

- 54 of the voters attempted to comply with the Board's October 27, 2003 directive which once again allowed third party deliveries of absentee ballots. Because they followed the Elections Board's well publicized rule set forth in that directive, disenfranchisement would be unconscionable **where voters were following a procedure laid down by the election authorities.**

- Because the 54 votes were improperly thrown out, the 16 legal absentee ballots that were disallowed because they were tainted by two ballots that also **followed the Elections Board's directive also had to be counted.**

- The remaining four individuals who voted by absentee ballots and had them delivered to the Elections Board by third parties attended the public hearing and gave sworn testimony. The Election Code does not prohibit third parties from assisting disabled electors from returning completed ballots to the Elections Board.

In an analogous case, our Supreme Court addressed the impact of an administrative body's misleading or negligent actions in disregard of expressed statutory procedures dealing with the time for filing an assessment appeal. In *Union Electric Corporation v. Board of Property Assessment, Appeals & Review of Allegheny County,* 560 Pa. 481, 746 A.2d 581 (2000), taxpayers received real estate assessment notices for their property and were going to file actions challenging their assessments prior to the last day of February 1996 pursuant to 72 P.S. § 5452.11. The school district moved to quash their appeals as untimely. However, without providing a reason for doing so, the Allegheny County Board of Property Assessment, Appeals and Review (Board) issued an order extending the time for filing appeals from February 29, 1996 to April 1, 1996. Based upon this change, taxpayers filed their appeals on March 27, 1996. After the Board held hearings on the appeals, taxpayers appealed to the trial court. The City of Pittsburgh School District filed motions to quash the appeals because they were filed beyond the statutory deadline. Taxpayers, however, argued that they were entitled to appeal *nunc pro tunc.* The trial court quashed the appeals as

untimely and refused to accept the appeals *nunc pro tunc.* We affirmed, holding that the Board had no authority to extend the filing deadline.

On appeal, our Supreme Court reversed, agreeing with taxpayers that the Board's negligent conduct in extending the tax assessment appeals deadline was a breakdown in the court's operations to allow a *nunc pro tunc* appeal. The Court first recited the law regarding *nunc pro tunc* appeals stating the following:

> Allowing an appeal *nunc pro tunc* is a recognized exception to the general rule prohibiting the extension of an appeal deadline. This Court has emphasized that the "principle emerges that an appeal *nunc pro tunc* is intended as a remedy to vindicate the right to an appeal where that right has been lost due to certain extraordinary circumstances." *Commonwealth v. Stock,* 545 Pa. 13, 19, 679 A.2d 760, 764 (1996). Generally, in civil cases, an appeal *nunc pro tunc* is granted only where there was "fraud or a breakdown in the court's operations through a default of its officers." *Bass,* 485 Pa. at 259, 401 A.2d at 1135; *see also Stock,* 545 Pa. at 18, 679 A.2d at 763; *Hanoverian, Inc. v. Lehigh County Bd. Of Assessment,* 701 A.2d 288, 289 (Pa.Cmwlth.1997) ("[A] court may not extend that time period or allow an appeal *nunc pro tunc* absent a showing that extraordinary circumstances involving fraud, or its equivalent, duress, or coercion caused the delay in filing an appeal.").

*Union Electric,* 560 Pa. at 486, 746 A.2d at 584. The Court then went on to hold that:

> Here, the Board extended the filing deadline for tax assessment appeals in contravention of 72 P.S. § 5452.11. The Board acted without authority, in violation of express statutory language, and misled Appellants into believing that they had the ability to extend the filing deadline. Moreover, the Board was cloaked with the apparent authority to extend the deadline because it was the governmental reviewing body before which the appeals were filed and the Appellants reasonably relied on this appearance of authority. Under these circumstances, we find that the Board's negligent action in extending the filing deadline constitutes a breakdown in the court's operations such that Appellants' appeals should be permitted *nunc pro tunc.*

*Id.*

 While the *Union Electric* case specifically involved a statute that dealt with a filing requirement,[8] the principle for which that case stands is also applicable here: when an administrative body acts negligently, improperly or in a misleading way (unintentionally or otherwise), there is a breakdown in the agency's operations, and when actions are taken by individuals based on the administrative body's acts, those individuals cannot be held responsible. We believe in this case that the 74 ballots were properly counted because the Elections Board knowingly failed to abide by the statutory language regarding the delivery of absentee ballots, changed its policy to require voters to abide by the

---

8. We note that in this Court's decision in *Union Electric,* 721 A.2d 823 (Pa.Cmwlth. 1998), *reversed,* 560 Pa. 481, 746 A.2d 581 (2000), we relied upon *In Re: Nomination Petition of Torres,* 99 Pa.Cmwlth. 173, 512 A.2d 732 (1986), where we held that the trial court had no authority to extend the seven-day mandatory statutory deadline for an addi-

tional seven days during which objections to nomination petitions could be filed. In reversing this Court in *Union Electric,* our Supreme Court in footnote 4 specifically found that estoppel was not at issue in *Torres,* inferring that if it was and was made out, that the deadline should have been allowed to be extended.

language, and then again changed its policy back to its original stance that voters did not have to abide by the statutory language, thereby misleading absentee voters regarding delivery requirements. Although Appellants argue that because the statute uses mandatory language in requiring each absentee voter to deliver his or her own ballot to the Elections Board that nothing can override that requirement, we agree with the trial court that it is more important to protect the interest of the voters by not disenfranchising them than to adhere to the strict language of the statute under these circumstances. Absentee voters cannot be held responsible for following statutory requirements which the Elections Board itself neither follows nor enforces consistently. As such, the trial court did not err by reversing the Elections Board and counting the 74 challenged absentee ballots.[9]

■ However, as to Mr. Rydzak's ballot, because the statute specifically requires that an absentee ballot be delivered to the Elections Board and admittedly his was not and he was not mistakenly informed that he could do otherwise, we reverse the trial court as to his vote and it will not be counted in the General Election.

Accordingly, the decision of the trial court is affirmed with the exception that Mr. Rydzak's absentee ballot is stricken.

Judge FRIEDMAN concurs in the result only.

### ORDER

AND NOW, this *22nd* day of *December*, 2003, our order of December 18, 2003, is amended to read as follows: The order of the Court of Common Pleas of Allegheny County, dated November 26, 2003, is affirmed with the exception that Mr. Ronald Rydzak's absentee ballot is stricken.

### DISSENTING OPINION BY Judge LEADBETTER.

I must respectfully dissent, at least in part. This court has long held that, "While it is true that a defect which is minor or technical in nature will not void an otherwise valid ballot, violations of substantive provisions of the Code cannot be overlooked on the pretext of pursuing a liberal construction." *In re April 10, 1984 Election of East Whiteland Township, Chester County,* 85 Pa.Cmwlth. 594, 483 A.2d 1033, 1036 (1984). Nothing in the present case causes me to conclude that we should depart from this longstanding principle. I fully agree with the majority and the trial court that the right to vote is of great importance and that we should not lightly disenfranchise citizens who have followed a local Board's announced procedure. However, there exists strong policy considerations on the other side of the coin which I believe must prevail under the circumstances presented here.

First, although the Board had adopted the procedure at issue, it must be noted that it was not only contrary to State law, but also contrary to the explicit written directions sent with the absentee ballots. Thus, any reliance by the voters can hardly be deemed reasonable, let alone compelling. More fundamentally, however, by adopting its estoppel doctrine, the majority has given *carte blanche* to local election

---

**9.** Even if we had found that the challenged absentee votes should not have counted, we would not have stricken the 18 votes that were discounted because two absentee votes that were delivered by third parties were mistakenly sent to the polling places. It is an abuse of discretion to disenfranchise 16 voters just because two of the voters were absentee voters who used third parties to deliver their ballots when there were no allegations of fraud alleged.

boards to establish whatever rules they choose, even where those rules violate explicit directives of the Election Code. So long as voters follow the Board's local practice, the statutory mandates must be ignored, or at least unenforced, in the name of protecting the franchise. Aside from being in derogation of law and our constitutional allocation of power,[1] as Judge Conti noted in the federal litigation, allowing a patchwork of different rules from county to county in a statewide election implicates equal protection concerns. *Cf. Bush v. Gore*, 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000).[2] Accordingly, I would reverse common pleas, in part, and disallow the fifty-six ballots known to have been hand-delivered by third parties.

I would not, however, disallow the eighteen ballots which were invalidated by the election Board because two improperly hand-delivered ballots were inadvertently co-mingled with sixteen others. First, the co-mingling was simply an error, not Board policy adopted in violation of the Code. Second, the vast majority of these ballots were undisputedly valid. In this circumstance, I would find the statutory violation to be *de minimis* and thus insufficient to disenfranchise the sixteen voters

who followed lawful procedures. Thus I would affirm common pleas as to those eighteen ballots.

### DISSENTING OPINION BY Judge SIMPSON.

I agree with the manner in which the thoughtful trial judge, the Honorable Joseph M. James, and the majority resolve the substantive problems for 74 absentee ballots created by Allegheny County's persistent departure from the absentee voting provision of the Pennsylvania Election Code (Election Code).[1] However, because no appeal was timely filed by a person aggrieved, I disagree that the matter was properly before the trial court.

The Election Code permits "any person aggrieved" by an election board order to appeal. Section 1407 of the Election Code, 25 P.S. § 3157. It is undisputed that the only entity to either file an appeal to or seek intervention with the trial court within the short statutory appeal period[2] was the Democratic State Committee.

Aside from the obvious concern that a political party may not be a "person" within the meaning of the Election Code,[3] our

---

1. Local bodies have only the authority granted them by the General Assembly, and even home rule municipalities may not act inconsistently with State laws of general application. *See Devlin v. Philadelphia*, 809 A.2d 980, 985 (Pa.Cmwlth.2002) [citing *Genkinger v. New Castle*, 368 Pa. 547, 549, 84 A.2d 303, 304 (1951)]. The Election Code empowers county boards of election "to make and issue such rules, regulations and instructions, *not inconsistent with law*, as they may deem necessary for the guidance of voting machine custodians, elections officers and electors." Section 302 of the Act of June 3, 1937, P.L. 1333, *as amended*, 25 P.S. § 2642(f) (emphasis added).

2. *Union Electric Corporation v. Board of Property Assessment, Appeals & Review of Allegheny County*, 560 Pa. 481, 746 A.2d 581 (2000), relied upon by the majority, does not com-

mand a different result. That case allowed a *nunc pro tunc* appeal because the tax assessment Board had erroneously extended a filing deadline. A breakdown in the administrative process is a classic ground for allowing nunc pro tunc appeals. Administrative error is not, however, a basis for changing *substantive law* to conform to the bureaucratic misconception.

1. Section 1306 of the Act of June 3, 1937, P.L. 1333, *as amended*, 25 P.S. § 3146.6.

2. Section 1407 of the Election Code, 25 P.S. § 3157, allows an appeal within two days after an election board decision is made "whether then reduced to writing or not...."

3. While the Election Code specifically defines "party" to mean "a political party, as defined in section 801 of this act [25 P.S. § 2831]," 25 P.S. § 2602(n), it does not define "person."

Supreme Court holds a political party does not enjoy standing to assert a reapportionment challenge because, lacking the right to vote, it is not aggrieved. *Erfer v. Commonwealth,* 568 Pa. 128, 794 A.2d 325 (2002); *Albert v. 2001 Legislative Reapportionment Comm'n,* 567 Pa. 670, 790 A.2d 989 (2002). Following this reasoning, a political party cannot be "aggrieved" by an election board decision because it does not have the right to vote.

Section 310 of the Election Code, 25 P.S. § 2650, does not compel a different result. Subsection (a) permits a "party or political body or body of citizens" to appoint watchers or attorneys to represent it at any session of the election board. 25 P.S. § 2650(a). Also, subsection (c) permits any "candidate, attorney or watcher" present at a recount or recanvass to raise objections to be decided by the election board, subject to appeal. 25 P.S. § 2650(c). Under these provisions, a "party or political body or body of citizens" must act through an identified individual. Age, citizenship, residence and registration, all qualifications for voting and therefore standing, of such person can be verified. Section 701 of the Election Code, 25 P.S. § 2811.

Here, however, no qualified elector, candidate, or appointed watcher or attorney brought the appeal. Thus, the statutory authority of a political party to appoint a watcher representative, while interesting, has no relevance to this case. The bare statutory authority cannot overcome the factual absence of timely appeal by a "person aggrieved" where no voting representative appealed.

If a political party itself enjoys standing to appeal based on the authority to appoint a representative to attend election board sessions, every "party or political body or body of citizens," resident or otherwise,[4] also enjoys standing. Because expanding the right to appeal to non-resident sponsors of candidates could have far-reaching consequences, it is a policy decision best left for others.

For the forgoing reasons, I would vacate the order of the trial court with regard to the appeal brought by the Democratic State Committee, thus reinstating the election board's order.

---

Article VII of the Election Code, 25 P.S. §§ 2811—2814, consistently refers to residence of a "person" in discussing the qualifications of electors. Section 802 of the Election Code, 25 P.S. § 2832, refers to a person's enrollment as a member of a political party as a condition to voting in a primary or holding party office.

4. Residence is a vital qualification of an elector. *See* Article VII of the Election Code, 25 P.S. §§ 2811—2814.