# IN THE SUPREME COURT OF PENNSYLVANIA
## MIDDLE DISTRICT

| | | |
|---|---|---|
| LEAGUE OF WOMEN VOTERS OF PENNSYLVANIA, CARMEN FEBO SAN MIGUEL, JAMES SOLOMON, JOHN GREINER, JOHN CAPOWSKI, GRETCHEN BRANDT, THOMAS RENTSCHLER, MARY ELIZABETH LAWN, LISA ISAACS, DON LANCASTER, JORDI COMAS, ROBERT SMITH, WILLIAM MARX, RICHARD MANTELL, PRISCILLA MCNULTY, THOMAS ULRICH, ROBERT MCKINSTRY, MARK LICHTY, LORRAINE PETROSKY, | : : : : : : : : : : : : : : : | No. 159 MM 2017 |
| Petitioners | : : : : : | |
| v. | : : : | |
| THE COMMONWEALTH OF PENNSYLVANIA; THE PENNSYLVANIA GENERAL ASSEMBLY; THOMAS W. WOLF, IN HIS CAPACITY AS GOVERNOR OF PENNSYLVANIA; MICHAEL J. STACK III, IN HIS CAPACITY AS LIEUTENANT GOVERNOR OF PENNSYLVANIA AND PRESIDENT OF THE PENNSYLVANIA SENATE; MICHAEL C. TURZAI, IN HIS CAPACITY AS SPEAKER OF THE PENNSYLVANIA HOUSE OF REPRESENTATIVES; JOSEPH B. SCARNATI III, IN HIS CAPACITY AS PENNSYLVANIA SENATE PRESIDENT PRO TEMPORE; ROBERT TORRES, IN HIS CAPACITY AS ACTING SECRETARY OF THE COMMONWEALTH OF PENNSYLVANIA; JONATHAN M. MARKS, IN HIS CAPACITY AS COMMISSIONER OF THE BUREAU OF COMMISSIONS, ELECTIONS, AND LEGISLATION OF | : : : : : : : : : : : : : : : : : : : : : : : : : | |

THE PENNSYLVANIA DEPARTMENT OF    :
STATE,                            :
                                  :
           Respondents            :

**DISSENTING OPINION**

**CHIEF JUSTICE SAYLOR**                    **FILED:  February 7, 2018**


I incorporate by reference my dissenting statement to the Order of January 22, 2018, per which the majority invalidated Pennsylvania's current congressional districting scheme.  In summary, I believe that:  the present exercise of extraordinary jurisdiction was improvident; this Court's review would benefit from anticipated guidance from the Supreme Court of the United States; awaiting such guidance is particularly appropriate given the delay, until 2017, of Petitioners' challenge to a 2011 redistricting plan; and the appropriate litmus for judicial review of redistricting should take into account the inherently political character of the work of the General Assembly, to which the task of redistricting has been assigned by the United States Constitution.  *See League of Women Voters of Pa. v. Commonwealth*, ___ Pa. ___, ___, ___ A.3d ___, ___, 2018 WL 496907, *1 (Jan. 22, 2018) (mem.) (Saylor, C.J., dissenting).

Further, I respectfully disagree with the majority opinion in many other material respects.  Initially, I certainly have no cause to differ with the broader strokes comprising the bulk of the opinion, including the historical accounts and the confirmation of "a voter's right to equal protection in the electoral process for the selection of his or her representatives in government," Majority Opinion, *slip op.* at 100, which is a right that is also recognized under federal constitutional law.  *See Vieth v. Jubelirer*, 541 U.S. 267, 292, 124 S. Ct. 1769, 1785 (2004) (plurality) (expressing agreement with a dissenting

Justice that severe partisan gerrymanders are inconsistent with democratic principles and may violate the Equal Protection Clause, albeit maintaining that the judiciary is incapable of devising manageable standards for the assessments of degree).

The Supreme Court of the United States has also emphasized, however, that redistricting is committed to the political branch and is inherently political.[1] In this regard, the application of constitutional principles governing individual rights in the context of legislative redistricting is *sui generis*, given the inevitable tension between the power allocated to the Legislature to make political choices and the individual rights of voters relative to the exercise of the franchise.[2] Moreover, in terms of the individual-rights component – and contrary to the majority's perspective – there is no right to an "equally effective power" of voters in elections, Majority Opinion, *slip op.* at 110. *Cf. Vieth*, 541 U.S. at 288, 124 S. Ct. at 1782 ("[T]he [federal] Constitution . . . guarantees equal protection of the law to persons, not equal representation in government to equivalently sized groups. It nowhere says that farmers or urban dwellers, Christian fundamentalists or Jews, Republicans or Democrats, must be accorded political strength proportionate to their numbers."). For example, the phenomenon of "packing,"

---

[1] *See generally Vieth*, 541 U.S. at 274-77, 124 S. Ct. at 1774-76 (discussing the history of political gerrymandering in the United States); *id.* at 285, 124 S. Ct. at 1781 ("The Constitution clearly contemplates districting by political entities, and unsurprisingly that turns out to be root-and-branch a matter of politics."); *id.* at 344, 124 S. Ct. at 1815 (Souter, J.) (observing "some intent to gain political advantage is inescapable whenever political bodies devise a district plan, and some effect results from the intent"); *id.* at 358, 124 S. Ct. at 1823 (Breyer, J.) (explaining that "political considerations will likely play an important, and proper, role in the drawing of district boundaries"); *Gaffney v. Cummings*, 412 U.S. 735, 753, 93 S. Ct. 2321, 2331 (1973) ("Politics and political considerations are inseparable from districting and apportionment.").

[2] *Cf. Vieth*, 541 U.S. at 360, 124 S. Ct. at 1824 (Breyer, J., dissenting) (depicting traditional or historically based voting-district boundaries as "an uneasy truce, sanctioned by tradition, among different parties seeking political advantage").

and the corresponding dilution of the effect of some votes, will occur naturally as a result of population distribution, particularly in urban areas where there is often an aggregation of similar-minded voters. *See Vieth*, 541 U.S. at 290-91, 124 S. Ct. at 1783; *id.* at 359, 124 S. Ct. at 1824 (Breyer, J., dissenting).

Given the political character of redistricting, the pervading question relating to partisan considerations, with which courts have had great difficulty, is "how much is too much?" *Id.* at 298, 124 S. Ct. at 1788 (quoting *id.* at 344, 124 S. Ct. at 1815 (Souter, J., dissenting)); *accord id.* at 313, 124 S. Ct. at 1796 (Kennedy, J., concurring) (commenting on the search for "suitable standards with which to measure the burden a gerrymander imposes on representational rights"). Rather than engaging this question in these conventional terms, the majority proceeds to overlay factors delineated by the Pennsylvania Constitution in relation to state-level reapportionment upon congressional redistricting. *See* Majority Opinion, *slip op.* at 119-124 (prioritizing the factors delineated in Article II, Section 16 of the Pennsylvania Constitution). Since these considerations are not constitutional commands applicable to congressional redistricting, the majority's approach amounts to a non-textual, judicial imposition of a prophylactic rule.

In this regard, it is significant that the majority's new rule is overprotective, in that it guards not only against intentional discrimination, but also against legislative prioritization of any factor or factors other than those delineated in Article II, Section 16, including legitimate ones. *See generally Duckworth v. Eagan*, 492 U.S. 195, 209, 109 S. Ct. 2875, 2883 (1989) (O'Connor, J., concurring) (explaining that prophylactic rules "overprotect[]" the value at stake). Significantly, such additional factors include other traditional districting criteria appropriate to political consideration -- such as the preservation of communities of interest, avoidance of pitting incumbents against each

other, and maintenance of the core of prior district lines. *See League of Women Voters*, ___ Pa. at ___, ___ A.3d at ___, 2018 WL 496907, *1 (Saylor, C.J., dissenting) (citing *Evenwel v. Abbott*, ___ U.S. ___, ___, 136 S. Ct. 1120, 1124 (2016), *Karcher v. Daggett*, 462 U.S. 725, 740, 103 S. Ct. 2653, 2663 (1983), and *Holt v. 2011 Legislative Reapportionment Comm'n*, 620 Pa. 373, 422-23, 67 A.3d 1211, 1241 (2013)).[3]

I do not dispute that prophylactic rules may be legitimate in certain contexts. But they are, by their nature, vulnerable to claims of illegitimacy. *See, e.g.*, *Dickerson v. United States*, 530 U.S. 428, 465, 120 S. Ct. 2326, 2348 (2000) (Scalia, J., dissenting) (depicting a prophylactic rule imposed by the Supreme Court of the United States as an

_____

[3] I am in no way suggesting that the factors prioritized by the majority are not traditional districting criteria or that they lack relevance to the claims of discrimination. My concern is with the manner in which the majority rigidifies these factors in the congressional redistricting context.

In this regard, the majority's standard would seem to operate more stringently than that suggested by Petitioners themselves, who urge this Court to set forth a test under Article I, Section 5 embodying a more conventional equal protection litmus – that is, one in which a challenger may prevail by demonstrating an intent to discriminate combined with a discriminatory effect. *See* Brief for Petitioners at 68 (stating this Court should adopt a standard whereby the challenger must show "intentional discrimination plus [a changed] outcome of an actual congressional election").

It is also not clear whether the requirement devised by the majority, as applied to state legislative reapportionment, would alter the review in the relevant line of cases. For example, I suspect that the state congressional redistricting plan approved in this Court's *Holt* decision would fail under the new regime imposed by the majority, since, there, the Court found that the challengers had not established that a reapportionment plan encompassing numerous political-subdivision splits violated Article II, Section 16 of the Pennsylvania Constitution. *See Holt*, 620 Pa. at 383, 67 A.3d at 1217 (explaining that the unsuccessful challenge to the 2012 state legislative reapportionment plan was brought by voters "who live in the Commonwealth's wards, municipalities, and counties the [2012 Final Plan] split, often multiple times, to form Senate and House of Representatives Districts"). This circumstance appears particularly troublesome because, although the state charter speaks directly to the constraints for state legislative districts, it does not mention congressional districts at all.

example of "judicial overreaching"). The consideration of whether this sort of rule should be imposed by the judiciary upon a process committed by the federal Constitution to another branch of government seems to me to require particular caution and restraint. *Accord Vieth*, 541 U.S. at 301, 124 S. Ct. at 1789 (discussing the drawbacks of "insertion of the judiciary into districting," including "the delay and uncertainty [it] brings to the political process and the partisan enmity it brings upon the courts"); *id.* at 291, 124 S. Ct. at 1784 (alluding to the interests in "meaningfully constrain[ing] the discretion of the courts, and to win public acceptance for the courts' intrusion into a process that is the very foundation of democratic decisionmaking").

Quite clearly, the character of redistricting, and concomitant separation-of-powers concerns, warrant special caution on the part of the judiciary in considering regulation and intervention. *See generally Colo. Gen. Assembly v. Salazar*, 541 U.S. 1093, 1095, 124 S. Ct. 2228, 2229 (2004) (Rehnquist, C.J., dissenting from denial of *certiorari*) (observing, in the context of a state supreme court's broad insertion of the judiciary into the redistricting process, that the constitutional "words, 'shall be prescribed in each State by the *Legislature* thereof' operate as a limitation on the State" (emphasis in original)). Indeed, as Justice Kennedy of the Supreme Court of the United States has opined: "A decision ordering the correction of all election district lines drawn for partisan reasons would commit federal and state courts to unprecedented intervention in the American political process[,]" yielding "substantial intrusion into the Nation's political life." *Vieth*, 541 U.S. at 306, 124 S. Ct. at 1792-93 (Kennedy, J., concurring).[4]

---

[4] Notably, this Court has previously recognized the more limited significance of the Article II, Section 16 factors relative to congressional redistricting. *See Erfer v. Commonwealth*, 568 Pa. 128, 142 n.4, 794 A.2d 325, 334 n.4 (2002).

From my point of view, the majority opinion fails to sufficiently account for the fundamental character of redistricting, its allocation under the United States Constitution to the political branch, and the many drawbacks of constitutionalizing a non-textual judicial rule. For my own part, I would abide by the Court's previous determination, in the redistricting setting, that the Free and Equal Elections Clause provides no greater protection than the state charter's Equal Protection Clauses, which have been deemed coterminous with the protection provided by the United States Constitution. *See Erfer v. Commonwealth*, 568 Pa. 128, 138-39, 794 A.2d 325, 332 (2002). I find that the majority's focus on a limited range of traditional districting factors allocates too much discretion to the judiciary to discern violations in the absence of proof of intentional discrimination. Instead, I believe that, under the state and federal charters, the discretion belongs to the Legislature, which should be accorded appropriate deference and comity, as reflected in the majority's initial articulation of the presumption of constitutionality and the heavy burden borne by challengers. *See* Majority Opinion, *slip op.* at 96.

As I said in my previous dissenting statement, I appreciate that the recommended factual findings of Judge Brobson of the Commonwealth Court suggest that the Court may be faced with a scenario involving extreme partisan gerrymandering. Were the present process an ordinary deliberative one, I would proceed to sift through the array of potential standards to determine if there was one which I could conclude would be judicially manageable. *See generally Vieth*, 541 U.S. at 292, 124 S. Ct. at 1784 (observing that, among the expressions of the four dissenting Justices in *Vieth*, three different standards had emerged). In my judgment, however, the acceptance of Petitioners' entreaty to proceed with extreme exigency presents too great of an

impingement on the deliberative process to allow for a considered judgment on my part in this complex and politically-charged area of the law.

Finally, as to the remedy, I disapprove of the imposition of a judicially-drawn map for the above reasons. Furthermore, as Justice Baer discusses at length, the *per curiam* Order inviting the Legislature to redraw Pennsylvania's congressional districts provided very little time and guidance in the enterprise. *See* Concurring and Dissenting Opinion, *slip op.* at 3, 8-11 (Baer, J.). Although I do not dispute that judicial intervention may possibly be appropriate – where a constitutional violation is established based on the application of clear standards pertaining to intentional discrimination and dilution of voting power, and the Legislature has been adequately apprised of what is being required of it and afforded sufficient time to comply – regrettably, I submit that this is simply not what has happened here.


Justice Mundy joins this dissenting opinion.